UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF

5012 2nd St E, West Fargo, North Dakota

Case No. _____

3:22-mj-101

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE**

I, Aaron Dunn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have

been since February 27, 2011. I am presently assigned to the FBI's Fargo Resident Agency

where my primary duties and responsibilities consist of conducting investigations of

individuals and businesses for possible violations of federal law. In my course of

employment as a Special Agent, I have received formal training in conducting

investigations of federal crimes, including completion of the FBI's Combating Public

Corruption course in 2017 in which topics covered included investigating various complex

financial crimes. I have conducted and participated in investigations involving, among

other violations, public corruption, cybercrimes, wire fraud, bank fraud, health care fraud,

money laundering, aggravated identity theft, and conspiracy. In the course of my

investigative experience I have learned individuals engaged in schemes to violate federal

law routinely use items such as computers, cellular telephones, and other electronic media

to access personal and business email accounts, and to transmit and receive records

through the Internet. Nearly all of my investigations have involved the seizure and review

of various forms of electronic media and/or digital records to identify evidence of violations

of federal law.

    2.    This matter is being jointly investigated by the FBI and a number of other federal

agencies.

    3.    I have personally participated in the investigation of a conspiracy executed by

Kyle Berg ("Berg") to fraudulently obtain contracts from federal government agencies

intended for small businesses owned by women, minorities, and/or service-disabled

veterans (commonly known as "set-aside contracts") to which he was not entitled. Berg

owns or controls businesses that purport to be owned by women, minorities, or service-

disabled veterans, but these companies are not actually managed and controlled by those

individuals, as required by federal law. All the conclusions and beliefs set forth in this

affidavit are based on my training and experience, and the facts of this investigation

obtained from conversations with other agents and attorneys, interviews conducted, review

of reports and documents in this case (including documents produced pursuant to grand

jury subpoenas), review of information provided by witnesses, and review of law

enforcement databases and publicly available records, among other sources. All the dates,

times, and amounts listed in this affidavit are approximate. This affidavit is intended to

show only that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter.

    4.    I have set forth facts that I believe are sufficient to establish probable cause to

believe that evidence, instrumentalities, and fruits of violations of 18 U.S.C. § 371

(conspiracy to commit offense or to defraud the United States), 18 U.S.C. § 1001 (false

statements), 18 U.S.C. § 1031 (major fraud against the United States), and 18 U.S.C.

§ 1343 (wire fraud) can be found at 5012 2nd St E, West Fargo, ND 58078, which is more

specifically described below in Paragraph 5 and in Attachment A to the search warrant.

## IDENTIFICATION OF THE PREMISES TO BE SEARCHED

5.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the following: the home of Berg and

Connie Berg ("Connie") located at 5012 2nd St E, West Fargo, North Dakota 58078 (the

"PREMISES") for documents and records regardless of the form or medium in which those

records are stored or maintained by Pro-Mark Services, Inc. ("Pro-Mark"), Razor Consulting

Solutions, Inc. ("Razor"), Fed Serve, LLC ("Fed Serve"), MDM Construction, LLC ("MDM"),

and OK2 Construction, LLC ("OK2"). These items are more specifically described below and

in Attachment B (attached hereto and incorporated herein).

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a

magistrate judge with authority in the district" and the property or persons at issue are

"located within the district." Fed. R. Crim. P. 41(b)(1).

## PROBABLE CAUSE

7.     There is probable cause to believe Berg and his co-conspirators fraudulently

participate in the 8(a) Business Development program ("8(a)"), Women Owned Small

Business program ("WOSB"), and Historically Underutilized Business Zone program

("HUBZone") administered by the Small Business Association ("SBA"), and the Service-

Disabled Veteran-Owned Small Business program ("SDVOSB") administered by the

Department of Veterans Affairs ("VA"), to compete for and obtain government set-aside

contracts to which they are not entitled, thereby preventing award of those set-aside

contracts to legitimate 8(a), WOSB, HUBZone, and SDVOSB small businesses. Through the

creation and affiliations of Pro-Mark, Razor, Fed Serve, MDM, and OK2, Berg and his co-

conspirators are able to fraudulently claim 8(a), WOSB, HUBZone, and SDVOSB statuses

for those entities in order to obtain millions in federal government set-aside contracts for which these entities did not qualify.

## Table of Contents:

BACKGROUND ON SET-ASIDE CONTRACTS ....................................................... 4

    Table 1: Government Contracting Assistance Programs ...................................... 6

    8(a) DEVELOPMENT PROGRAM ...................................................................... 6

    WOMAN-OWNED SMALL BUSINESS PROGRAM ........................................... 8

    HUBZONE PROGRAM ........................................................................................ 9

    SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS PROGRAM ................10

    CONTRACT AWARD REQUIREMENTS ............................................................11

FACTS ESTABLISHING PROBABLE CAUSE ..................................................11

    Table 2: Companies and Entities.......................................................................13

    Table 3: Individuals ...........................................................................................14

    PRO-MARK SERVICES, INC..............................................................................16

    RAZOR CONSULTING SOLUTIONS, INC. & PMR SERVICES, LLC ............................27

    FED SERVE, LLC..............................................................................................38

    MDM CONSTRUCTION, LLC ...........................................................................50

    OK2 CONSTRUCTION, LLC .............................................................................58

PROBABLE CAUSE TO SEARCH THE PREMISES ..........................................70

COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS ..........................74

BIOMETRIC ACCESS TO DEVICES ................................................................80

## BACKGROUND ON SET-ASIDE CONTRACTS

8.      When procuring goods and services, the United States limits competition for certain federal contracts by setting aside contracts to award to certified and qualified small businesses. Agencies also can award certain contracts below a monetary threshold to small business concerns on a sole-source basis ("sole-source contracts").

9.      To help small businesses qualify for set-aside and sole-source contracts, the SBA administers contracting assistance programs, including the 8(a) program, the WOSB

program, and the HUBZone program.  The VA's Center for Verification and Evaluation ("CVE") evaluates whether a business qualified as an SDVOSB. The CVE uses the SBA's regulations to determine whether a business is owned and controlled by a service-disabled veteran.

10.     *Small size*. To qualify for each of the 8(a), WOSB, HUBZone, and SDVOSB programs, a business must qualify as a "small" business. The size standard for small businesses is formulated based on the business's industry classification under the North American Industry Classification System ("NAICS"), revenues, and affiliates. For the industries relevant to this investigation, the SBA determines the size of the business as a three- or five-year average of total annual receipts or gross income. For example, the NAICS code for Commercial and Institutional Building Construction corresponds with a $36.5 million size standard. SBA laws and regulations require a business to report income from all affiliated businesses, as explained below. Affiliated businesses are included within the scope of the size calculation. The SBA's size regulations are primarily contained within 13 C.F.R. Part 121.

11.     *Control*. Generally, the SBA-certified individual or service-disabled veteran who owns the business also must control the business in its strategy and long-term decisions, as well as its day-to-day management. Impermissible control arises when a non-disadvantaged person or business has power to control the applicant small business through ownership, management, or other relationships or dependent contracts. Each program specifies the factors relevant to control in federal regulations.

12.     *Affiliation*. The SBA considers any businesses or individuals affiliated with the applicant small business to determine the applicant's size and whether any individual exercises impermissible control over the small business. Affiliation may exist, for example, when a non-small or non-disadvantaged business provides management or staffing for a

new applicant small business in its same industry, or furnishes contracts, financial support, or indemnification on bonds. Patterns of subcontracting; commingling staff, facilities, or funds; and attempts to hide the true nature of a relationship between businesses may indicate impermissible affiliation. The size of an affiliated business (i.e., its annual receipts or gross income) is added to the size of the applicant business for purpose of determining the applicant business's size. For size calculations, the VA relies on SBA determinations of affiliation. To determine control, the VA similarly considers whether an applicant for SDVOSB status is overly dependent on other non-SDVOSB entities.

**Table 1: Government Contracting Assistance Programs**

| Program | Relevance to Scheme |
|---|---|
| 8(a) Business Development | Provides assistance to small businesses unconditionally owned and controlled by one or more socially and economically disadvantaged individuals. |
| Mentor-Protégé | Allows a non-8(a) business to form a joint venture for mentorship purposes with an 8(a) small business to perform a contract for which only the 8(a) small business qualifies, but does not have capacity to perform on its own. |
| Women Owned Small Business | Provides assistance to small businesses unconditionally and directly owned and controlled by one or more women. |
| Historically Underutilized Business Zone | Provides assistance to small businesses located in Historically Underutilized Business Zones to increase employment opportunities, investments, and economic development. |
| Service-Disabled Veteran-Owned Small Business | Provides assistance to small businesses unconditionally and directly owned and controlled by one or more service-disabled veterans. |

## 8(a) DEVELOPMENT PROGRAM

13.     The federal government's goal is to award at least 5% of all federal contracting dollars to small disadvantaged businesses each year. To help meet this goal, the SBA's 8(a) program (named for Section 8(a) of the Small Business Act) provides assistance to small businesses owned and controlled by socially and economically disadvantaged individuals to

gain a foothold in government contracting. Participation in the 8(a) program is limited to nine years, with the goal that the 8(a) business can thrive in a competitive business environment after its graduation from the program. SBA regulations governing the 8(a) program are primarily contained within 13 C.F.R. Part 124.

14.     The SBA's 8(a) program requires that a small business applicant has not previously participated in the 8(a) program; is at least 51% unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States; and demonstrates its potential for success.

15.     *Control.* The small business must be controlled only by socially and economically disadvantaged person(s). Factors relevant to evaluating whether an applicant is controlled by an eligible person include whether a socially and economically disadvantaged person has both the requisite management capabilities to, and actually does, manage the business, works full-time for the business during normal business hours, and holds the highest officer position in the company. While a non-disadvantaged individual or entity may be involved in the business, that individual may not exercise control over the business.

16.     *Certification.* To become certified as an eligible 8(a) business, the applicant business must establish it is owned and controlled by an eligible individual by submitting SBA Form 1010 with supporting documentary evidence, such as its articles of incorporation, operating agreements, personal financial statements of the individual, and a narrative describing the history and nature of the business. SBA Form 1010 warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. The small business must recertify annually to maintain eligibility in the program.

17.     *Mentor-Protégé Program.* The SBA's Mentor-Protégé program allows a non-8(a) business (the mentor) to form a joint venture with an 8(a) small business (the protégé) to perform a contract for which only the 8(a) small business qualifies, but does not have capacity to perform on its own (e.g., a protégé firm could seek a WOSB set-aside contract with its mentor, provided the protégé firm qualifies as a WOSB, even if the mentor firm would not itself qualify for such a contract). The SBA requires the mentor and protégé businesses to enter into a written joint venture agreement, approved by the SBA, detailing the protégé's needs and the assistance the mentor will provide to meet those needs. For each joint venture agreement, the protégé must be responsible for controlling the day-to-day management and administration of the contract, and the protégé must perform at least 40% of the substantive contractual work. A mentor cannot control the manager of the protégé or otherwise be affiliated with the protégé. Factors relevant to affiliation include management and contractual relationships. Affiliation arises when the same individual exercises control over both the protégé and another small business (such as the mentor company).

**WOMAN-OWNED SMALL BUSINESS PROGRAM**

18.     The federal government's goal is to award at least 5% of all federal contracting dollars to WOSBs each year. Further, certain federal contracts are restricted to WOSBs when the SBA has determined that WOSBs are underrepresented in procurement. The WOSB program assists small businesses owned and controlled by one or more women to gain federal contracts. Regulations governing the WOSB program are primarily contained within 13 C.F.R. Part 127.

19.     The SBA's WOSB program requires that the small business is at least 51% unconditionally and directly owned and controlled by one or more women who are United States citizens.

8

20.    *Control.* A WOSB must be controlled and managed on a full-time basis by only women. Factors relevant to evaluating whether a WOSB is controlled by a woman include whether a woman holds the highest position in the business, has the management experience necessary to run the business, and whether the woman is engaged in outside employment that prevents her from controlling the day-to-day business operations. While men or other entities may be involved in managing the business, they may not control the business.

21.    *Certification.* To become certified as a WOSB, the applicant business must establish it is owned and controlled by an eligible individual by submitting SBA Form 1010 with supporting documentary evidence, such as its articles of incorporation, operating agreements, personal financial statements of the individual, and a narrative describing the history and nature of the business. SBA Form 1010 warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. Until October 2020, WOSBs could self-certify that they were eligible by submitting annual representations under penalty of perjury; after October 2020, the certification process changed and now the SBA certifies eligibility for WOSBs.

**HUBZONE PROGRAM**

22.    The federal government aims to award at least 3% of federal contracting dollars to small businesses located in historically underutilized business areas (HUBZones) such as rural areas, Indian land, and census tracts with low household incomes, to increase employment opportunities, investments, and economic development in these areas. Regulations governing the HUBZone program are primarily contained within 13 C.F.R. Part 126.

23.    To be eligible for the HUBZone program, the small business must be at least 51% owned and controlled by a United States citizen. Additionally, the applicant's principal

office must be located in the HUBZone, although the business may have other offices outside of the HUBZone. At least 35% of the employees must reside in a HUBZone (though it is not necessary that the employees reside in the HUBZone of the principal office location).

24.     *Certification.* To become certified for the HUBZone program, the small business must provide documentation identifying each employee, his/her job location, and his/her payroll information to demonstrate satisfaction of the SBA's definition of employee, and the lease agreement for the principal office to verify its HUBZone location. To maintain its HUBZone status, the business must certify that it will attempt to maintain at least 35% of its employees residing in a HUBZone during performance of a HUBZone contract.

**SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS PROGRAM**

25.     The federal government aims to award approximately 3% of all federal contracting dollars to SDVOSBs each year. Regulations governing the SDVOSB program are primarily contained within 13 C.F.R. Part 125 and 38 C.F.R. Part 74.

26.     To be eligible for the SDVOSB program, the applicant business must be least 51% unconditionally and directly owned and controlled by a veteran with a service disability recognized by the VA or the Department of Defense.

27.     *Control.* The business must be controlled by only service-disabled veterans. As part of demonstrating control, the service-disabled veteran must be the highest paid person, hold the highest officer position, and receive at least 51% of profit from the business. Factors relevant to evaluating whether an applicant is controlled by a non-service-disabled veteran individual or ineligible entity include whether the applicant shares employees or resources with another company, whether another entity or individual provides critical financing or bonding support to the applicant, and whether the extent of business

relationships with another company leaves the applicant so dependent on the other company that it cannot exercise independent business judgment.

28.    *Certification.* To become certified as an SDVOSB, the applicant business must establish it is owned and controlled by an eligible individual by submitting VA Form 0877 with supporting documentary evidence. Form 0877 warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. Prior to 2011, the SDVOSB could self-certify its eligibility for the program. Since 2011, the CVE has verified eligibility by relying on the truthfulness and accuracy of documentation provided by the SDVOSB applicant. After verification, SDVOSBs must seek reverification periodically.

**CONTRACT AWARD REQUIREMENTS**

29.    To seek a contract or purchase agreement with the federal government, a business must be registered with the General Services Administration ("GSA") through their online portal, the System for Award Management ("SAM"), accessible online at www.SAM.gov.  Businesses must regularly renew or update their SAM registration to continue to seek federal government contracts. Contracting officers for government agencies, including the VA, the Department of Defense, GSA, Department of Health and Human Services, Department of Interior, and Department of Agriculture, rely upon the certifications of eligibility in SAM to award set-aside contracts.

<u>**FACTS ESTABLISHING PROBABLE CAUSE**</u>

30.    GSA opened this investigation in September 2018 when information found during a routine proactive initiative revealed that two seemingly unaffiliated companies—Pro-Mark and OK2—were both updating their company information in the SAM website from a common computer in Fargo, North Dakota. Pro-Mark is a retail and construction business headquartered in North Dakota, incorporated there in June 2001, and owned at the time by

11

Connie, who applied for and was accepted into the 8(a) program based on gender bias.  Pro-Mark also later self-certified as a WOSB. OK2 is a construction business headquartered in Texas, incorporated there in June 2015, and majority owned by Kenneth Kurk, who is a service-disabled veteran. The common connection between these two entities appears to be Berg—Connie's husband and a minority owner of OK2.

31.     The investigation has revealed that the day-to-day operations and long-term decision making of Pro-Mark and OK2 are not actually managed and controlled by their woman and service-disabled owners as is required by the relevant federal regulation. Instead, Berg—a white, non-disadvantaged, non-service-disabled-veteran man who is not eligible for government set-aside contracts—manages and controls both companies. The investigation has further revealed that Berg exercises impermissible control over several more 8(a), WOSB, HUBZone, and SDVOSB businesses.

32.     On November 4, 2020, the United States District Court for the District of North Dakota issued a search warrant ordering Microsoft Corporation, USA ("Microsoft") to disclose information associated with business email accounts for Berg and his co-conspirators' various 8(a), WOSB, HUBZone, and SDVOSB businesses involved in the scheme to obtain government set-aside and sole-source contracts. The warrant applied to information associated with the following Pro-Mark, Fed Serve, and OK2 employee accounts: Kyle Berg (kyle@gopromark.com, kyle@ok2construction.com, kyle@fedservllc.com), Chad DuBois (chad@gopromark.com), Mandy Grant (mandy@gopromark.com, mandy@ok2construction.com), Kevin Pietruszewski (kevin@gopromark.com, kevin@ok2construction.com), Kenneth Kurk (kenneth@ok2construction.com), and Osvaldo "Ozzie" Cruz (ozzie@ok2construction.com). Review of these emails and documents provides the basis for a number of the facts recited below.

12

33.    Additional emails and documents were obtained from federal agencies, including copies of Pro-Mark, Fed Serve, and MDM's applications and certifications submitted to the SBA or VA purportedly establishing eligibility for these federal programs. Review of these emails and documents provides the basis for additional facts recited below.

**Table 2: Companies and Entities**

| Company or Entity | Role in Scheme |
|---|---|
| BAD Investments | Real estate development company partially owned by Kyle Berg (50%). |
| CS DuBois Construction | Construction company owned by Chad DuBois that previously was enrolled in the 8(a) program. Berg and Walters worked at CS Dubois simultaneously. |
| DJW Holdings LLC | Property company owned by Dan Walters. |
| FedGenius LLC | Company owned by Mallely Kurk (70%) and Kenneth Kurk (30%). |
| Fed Serve, LLC | HUBZone company owned by Kyle Berg. |
| KRB Holdings, LLC | Property company represented by Kyle Berg. |
| Marlin Creek Holdings, LLC | Property company owned by Kyle Berg and Dan Walters. |
| MDM Construction, LLC | SDVOSB company owned by Daniel Walters. |
| OAC Action Construction Corp. | Company owned by Orlando Cruz, Sr. and Ozzie Cruz that previously was enrolled in the 8(a) program. |
| OAC Group Properties, LLC | Property company represented by Ozzie Cruz. |
| OK2 Construction, LLC | SDVOSB company owned by Kenneth Kurk (51%), Kyle Berg (24.5%), and Ozzie Cruz (24.5%). |
| PMR Services, LLC | Joint venture between Pro-Mark and Razor under mentor-protégé agreement. |
| PMR Services II, LLC | Joint venture between Pro-Mark and Razor under mentor-protégé agreement. |
| Pro-Mark Services, Inc. | 8(a) and WOSB company owned by Connie Berg until August 2020. |

| Razor Consulting Solutions, Inc. | 8(a) and WOSB company owned by Carla Schwartzenberger (51%) and Eric Mauch (49%). Had mentor-protégé agreement with Pro-Mark. |
| --- | --- |
| Tunheim Construction | 8(a) company with which Pro-Mark had a mentor-protégé agreement. |
| Tunheim Holdings, LLC | Owns Tunheim Construction. Berg leases Fed Serve's principal office from Tunheim Holdings. |

**Table 3: Individuals**

| Individual | Role in Scheme |
| --- | --- |
| Melissa Beer | Razor employee. |
| Blake Berg | Son of Kyle and Connie Berg. Part-time Fed Serve employee. |
| Connie Berg | Former owner of Pro-Mark and spouse of Kyle Berg. Purported to control Pro-Mark but actually had very limited role. |
| Evan Berg | Son of Kyle and Connie Berg. Part-time Fed Serve employee. |
| Kyle Berg | Former Vice President of Pro-Mark. Owner of Fed Serve. Minority owner of OK2. Controlled Pro-Mark and OK2 and exerted substantial control over Razor and MDM. |
| Orlando Cruz, Sr. | Majority owner of OAC Action Construction Corp and father of Ozzie Cruz. |
| Osvaldo "Ozzie" Cruz | Minority owner of OK2 and OAC Action Construction Corp. |
| Chad Davis | Pro-Mark employee who was represented as an OK2 employee. |
| Joey Dawson | Tunheim Construction employee. |
| Dave Dietrich | Pro-Mark employee who was later moved to MDM. |
| Chad DuBois | Pro-Mark employee who acted as controller of OK2 and did work for Fed Serve. |
| Paige DuBois | Daughter of Chad DuBois. Part-time Fed Serve employee. |
| Melanie Foley | Pro-Mark employee who was later moved to MDM. |
| Mandy Grant | Pro-Mark employee who did work for Razor, Fed Serve, and OK2 and represented herself as an OK2 and Razor employee. |
| Kari Hazer | MDM employee. |

| | |
|---|---|
| Tyler Kellen | Pro-Mark employee who represented himself as a Razor and Fed Serve employee. |
| Will Klinke | Pro-Mark employee hired to work on Razor, PMR, and PMR II projects. Did work for Fed Serve. |
| Kenneth Kurk | Service-disabled veteran. Majority owner of OK2 and minority owner of FedGenius. Nominally in control of OK2, but in reality substantially dependent on Berg and Pro-Mark. |
| Mallely Kurk | Spouse of Kenneth Kurk and majority owner of FedGenius. |
| Anthony Luchsinger | Fed Serve employee whose salary was at least partially reimbursed by Tunheim Construction. |
| Denise Luther | External accountant for Pro-Mark, Fed Serve, MDM, and OK2. |
| Jason Luther | External accountant for Pro-Mark, Fed Serve, MDM, and OK2. |
| Eric Mauch | Minority owner of Razor. |
| Lily Mendoza | OAC Action Construction Corp. employee who represented OK2 at a bid meeting. |
| Dan Noyes | Pro-Mark employee who did work for Fed Serve. |
| Larry Peihl | Pro-Mark employee who represented himself as an MDM employee and was later moved to MDM. |
| Darin Perius | Razor employee hired to manage government contracts. |
| Kevin Pietruszewski | Pro-Mark employee who did work for OK2 and Razor, and represented himself as a Razor employee. |
| Willy Reina | OAC Action Construction Corp. employee who did work for OK2. |
| Carla Schwartzenberger | Native American majority owner of Razor. |
| Tammy Stavenes | Pro-Mark employee who did work for Razor and was later moved to MDM. |
| Jason Tejral | Pro-Mark employee who did work for Fed Serve and Razor. |
| Billy Thomas | OK2 employee who received a vehicle and expenses from OAC Action Construction Corp. |
| Christopher Tunheim | Ultimate owner of Tunheim Construction; reimbursed Berg for wages of an employee of Fed Serve. |
| Tyler Walker | Pro-Mark employee who did work for Razor. |
| Daniel Walters | Service-disabled veteran owner of MDM. |

**PRO-MARK SERVICES, INC.**

34.     According to documents Connie Berg submitted to the SBA on behalf of Pro-Mark

during its application to the 8(a) program, Pro-Mark was incorporated by Kyle and Connie

Berg under the laws of North Dakota on June 26, 2001, for the purpose of specialty retail

sales. On August 1, 2007, Berg transferred his 49% ownership of Pro-Mark to Connie,

making her Pro-Mark's sole owner. After gifting his stock to Connie, Berg continued as a

full-time employee of Pro-Mark. According to documents obtained from the prior search

warrant to Microsoft, including Pro-Mark board materials, internal emails, and financial

statements, and a publicly available press release, Connie owned Pro-Mark until August

31, 2020, when the company was sold through an Employee Stock Ownership Plan

("ESOP") for over $28 million to Pro-Mark's employees.

35.     Just three months after Berg transferred the business to her in full, on

December 6, 2007, Connie applied to the 8(a) program on behalf of Pro-Mark, claiming

status as an economically and socially disadvantaged individual. In her application to the

SBA, Connie claimed social disadvantage on the basis of gender bias. On May 23, 2008, the

SBA accepted Pro-Mark into the 8(a) program, based on the facts Connie presented in her

application. In her 8(a) application, Connie stated that she was responsible for "all control,

management, and business decisions relating of Pro-Mark." The application also certified

that she was the only director, officer, management member, key employee, or owner of the

company, and that she worked 40 hours per week for Pro-Mark. The application indicated

that Pro-Mark earned 100% of its revenue in NAICS code 448190 (Other Clothing Stores).

36.     From 2010 to 2016, Pro-Mark filed SBA Form 1010 annually to recertify for the

8(a) program. In her capacity as "President/CEO/Proprietor/Management Member/General

Partner," Connie apparently signed and certified these forms, which each represented that

she was the president and 100% owner of Pro-Mark and dedicated 40 hours per week to

managing the company. Connie also certified that no one other than "an economically and socially disadvantaged individual. . .hold[s] the highest position in the business," the individual holding the highest position in the small business works full-time at the business, and that Pro-Mark had no affiliations. Each of these forms contain a certification that the responses to the questions are true and complete, and an acknowledgement that the SBA is relying on the form to determine the small business's 8(a) program eligibility. The forms warn that an applicant is subject to criminal prosecution for providing false information or making misrepresentations.

37.    Beginning in 2015, in addition to its 8(a) status, Pro-Mark self-certified its status as a WOSB (self-certification was permitted for the WOSB program until October 2020 when the SBA's regulations changed). The certifications included that "management and daily business operations of the concern are controlled by one or more women. Control means that both the long-term decision making and the day-to-day management and administration of the business operations are conducted by one or more women"; a "woman holds the highest officer position in the concern and her resume evidences that she has the managerial experience of the extent and complexity needed to run the concern"; and "[t]he woman who holds the highest officer position of the concern manages it on a full-time basis and devotes full-time to the business concern during [normal] working hours." These representations were submitted under warning that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations.

38.    For each bid that Pro-Mark submitted for WOSB set-aside or sole-source contracts, a Pro-Mark employee was generally required to certify that the company met all SBA standards, including that a woman controlled the small business. These representations were submitted under warning that the individual certifier is subject to

criminal prosecution if the individual certifier provides false information or makes misrepresentations on behalf of the bidding company.

39.    By virtue of its set-aside statuses, Pro-Mark has received hundreds of government contracts from the VA, Army, Air Force, and other agencies totaling millions of dollars.

40.    This investigation, however, has uncovered evidence that Pro-Mark is not controlled by Connie or any other disadvantaged individual as required by the 8(a) program, or any other woman per WOSB requirements. Rather, Connie's role in the business is nominal. Her husband—Berg, a non-disadvantaged, white man— manages and controls all day-to-day operations of the business. Berg's level of involvement in and control over the business have not been disclosed to the SBA.

41.    Evidence shows that nearly all of Pro-Mark's work is in construction. Per 8(a) and WOSB program requirements, having the requisite management experience is one factor for determining control; Connie appears to lack the experience necessary to manage a construction company.

   a.  Pro-Mark registered for specialty retail sales upon incorporation and indicated in its 8(a) program application that it earned 100% of its revenue in NAICS Code "Other Clothing Stores." According to the resume that Connie submitted to the SBA with her 8(a) application, Connie's background is in screen-printing fabric and clothing. Her prior experience includes employment at Logotech, a company engaged in making custom promotional products, and Creative Imprintz, a branded apparel business. Connie has never indicated to the SBA that she has any experience or training in construction.

   b.  Berg has significant past experience in construction. He was previously employed as a vice president and project manager at CS DuBois Construction ("CS DuBois")

through December 2008, according to Berg's resume that OK2 submitted to the CVE when seeking verification as an SDVOSB in April 2016. CS DuBois graduated from the 8(a) program in July 2007.

c.   According to emails between an SBA employee and a North Dakota state employee regarding Pro-Mark's new status as an 8(a) firm, the same year it was accepted into the 8(a) program, Pro-Mark had more business in construction than in Other Clothing Stores—the NAICS code that Connie indicated Pro-Mark earned 100% of its revenue from in its 8(a) application.

d.   In a business plan Pro-Mark submitted to the SBA in 2009, Pro-Mark explained that "to increase Pro-Mark's functionality and diversity and make the most of Kyle's 14 years of experience, Pro-mark [sic] started construction activity in 2007. Pro-Mark's main goal is to continue to grow and tap into federal government business opportunities. With Connie's experience in promotional and clothing and Kyle's experience within the construction industry and government contracts, a unique mix is found." This business plan was apparently signed by Connie Berg in her capacity as Pro-Mark's president.

e.   By 2014, an independent audit of Pro-Mark's accounts showed that the clothing component of the business accounted for less than 1% of its annual revenue.

f.   From 2009 through 2021, Pro-Mark has obtained over 2,000 government contracts for a variety of construction-related services. Not a single government contract identified to date relates to clothing or retail sales.

42.   Documents, including emails obtained from the prior search warrant to Microsoft, indicate that the marketing arm of Pro-Mark is viewed as entirely separate from Pro-Mark's primary construction business:

a.  In a January 2018 email, Kurk, co-owner of one of Berg's other businesses, inquired if Berg's "wife's marketing company" produced printed marketing materials, referring to Connie's work at Pro-Mark as if it were an entirely separate business.

b.  In a January 2019 email, Pro-Mark's external accountant, Jason Luther, stated that he recorded $897 of sales for custom jerseys and shorts "in Connie's retail books."

c.  Connie indicated she is in the "Retail Sales and Marketing Division" of Pro-Mark in a resume she submitted to the SBA in 2020.

43.   Pro-Mark emails obtained from the prior search warrant to Microsoft indicate that Connie was not involved in the day-to-day management or long-term strategy goals of the business. Rather, Berg—a white, non-disadvantaged man—directed all day-to-day operations and strategy of Pro-Mark's business. Even after Pro-Mark was sold through the ESOP in August 2020, Berg continued to exercise control over the business.

44.   For example, Connie was not meaningfully involved in daily email communications regarding Pro-Mark's business. Connie rarely communicated with Pro-Mark employees, let alone about government contracts, according to an analysis of all emails retrieved from the search warrant. However, according to that same analysis, Pro-Mark employees did email Berg extensively about the day-to-day management of Pro-Mark, and conducted a large volume of business strategy and planning activities relating to government contracts via email without involving Connie. Pro-Mark employees infrequently emailed Connie's personal email account (berg_connie@hotmail.com), and even less frequently emailed her Pro-Mark business account, as shown below:

a.  Chad DuBois was Pro-Mark's controller until he was promoted to vice president in July 2019. According to a review of emails available from a search of his Pro-

Mark email account, DuBois had no emails in his account to or from Connie's

Pro-Mark business email account. DuBois had only three emails in his account

corresponding with Connie's personal email: one was related to the ESOP; one

was purely social in nature; and one was an email Connie forwarded from an

insurance company asking why Connie and Pro-Mark had not responded to

comply with a required audit.

b.   By way of comparison, DuBois's business account contained over 3,000 emails

received from Berg's business email accounts and 7,343 emails sent to Berg's

business email accounts.

c.   Similarly, Mandy Grant, Pro-Mark's office manager who was ultimately

promoted to treasury/secretary in July 2019, had no emails in her account to or

from Connie's business email account. Grant's business account contained eight

emails corresponding with Connie's personal Hotmail account related to custom

clothing orders for Connie's screen-printing business.

d.   By way of comparison, Grant had over 1,000 emails from Berg's business email

accounts and 369 emails sent to Berg's business email accounts in her business

email account.

e.   In the limited instances in which Connie was sent a business-related email, she

forwarded such emails to Berg or other Pro-Mark employees without comment.

For example, in February 2020, Connie forwarded a notice purportedly from

SAM to Berg with no comment. In July 2020, Connie forwarded a satisfaction

survey from the Defense Finance and Accounting Service to Berg with no

comment.

45.   Berg determined which government contracts Pro-Mark would bid and directed

employees how to complete proposals, based on a review of emails obtained from the prior

search warrant. For example, Connie was not included on any of the below emails sent by Berg:

    a.  In August 2018, Berg circulated a project to-do list for Ellsworth Air Force Base detailing the status of a number of open items, flagging key dates, identifying areas for which to hire subcontractors, and circulating progress schedules and budgets.

    b.  In October 2019, Berg instructed employees not to include specific dollar amounts for cost savings in a proposal for barrier work at Offutt Air Force Base.

    c.  In December 2019, Berg instructed employees to bid a job even though Pro-Mark lacked the resources to do so, noting, "we will bring new people in."

    d.  In April 2020, Berg provided specific instructions to Pro-Mark employees assigning tasks and detailing how to complete past performance questionnaires and other informational worksheets for a project for Dyess Air Force Base. Berg also managed communications with the architecture and engineering firm involved in putting together this bid.

    e.  In April 2020, Berg again provided employees with detailed instructions of what to include with a bid sheet for a project for Langley Air Force Base. Berg directed the employees how to frame the proposal scope letter and address how Pro-Mark solicited subcontractors and suppliers; what to include in the preliminary schedule; how to break out the bid sheet with specific overhead, profit, and bond rates, and account for state taxes; and to include subcontractor and supplier quotes.

46.    On numerous occasions, Berg instructed Pro-Mark employees to sign official documents, such as government contracting proposals and joint venture documents, on Connie's behalf. Review of the emails obtained from the search warrant has uncovered no

evidence that Connie saw, reviewed, or approved these documents; she was not included on such communications. For example, in May 2019, Berg asked Pro-Mark's then-office manager Mandy Grant to sign Connie's name on a teaming agreement between OK2 and Pro-Mark for a VA project proposal.

47.    Berg was in direct contact with the government on behalf of Pro-Mark with no indication that Connie was involved in or provided input into these discussions, according to a review of government files, government emails, and emails obtained from the search warrant.

   a.   In April 2017, Berg—not Connie—submitted a letter to the SBA clarifying Pro-Mark's teaming agreement with Tunheim Construction.

   b.   In March 2018, Berg—not Connie—submitted certifications to the SBA for a size determination.

   c.   In October 2020, Berg—not Connie—received an automatic notification from a Nebraska regulator, informing him that Pro-Mark's contractor registration expired and the company could be subject to fines.

48.    According to a review of internal Pro-Mark emails obtained from the prior search warrant, Berg decided employee hiring, salary, and raises. Connie was not included on these emails and did not appear to have any input into these decisions, as shown below:

   a.   In July 2019, Berg directed Pro-Mark's external accountants, Denise and Jason Luther, to implement raises for newly appointed Pro-Mark Vice President Chad DuBois and Secretary/Treasurer Mandy Grant.

   b.   In September 2019, Berg agreed to decrease DuBois's salary by $5,000 and pay him that money in a lump sum instead. Berg further agreed to instruct Pro-Mark's accountant to pay the sum as a wage not a bonus; not to take taxes out of the check; and to print DuBois a check, rather than issuing a direct deposit.

23

c. In May 2020, Berg assessed a job candidate for a Construction Project Manager position for Pro-Mark for a project on MacDill Air Force Base. Berg reviewed the application, communicated directly with the candidate, and evaluated his qualifications.

d. In July 2020, Berg instructed Grant (now Secretary/Treasurer) and DuBois (now Vice President) what salary and benefits to offer a Pro-Mark employee.

49. Berg managed Pro-Mark's financials, including company bank accounts, loans, and payroll, according to emails obtained via search warrant and grand jury subpoenas to financial institutions.

a. For example, in June 2019, Berg instructed bankers at the Capital Credit Union—where both Pro-Mark and Berg personally held accounts—to "transfer $60,000 from Pro-Mark into my personal account and wire the funds," asking for the transfer to be done by 11 a.m.

b. In November 2019, Berg instructed bankers at the Capital Credit Union to "transfer 137,526.34" from Marlin Creek Holdings, LLC ("Marlin Creek Holdings") to Pro-Mark Services checking." Marlin Creek Holdings is another company Berg partially owns with Dan Walters, according to documents Marlin Creek Holdings submitted to the SBA pursuant to a disaster loan application.

c. In December 2019, Berg instructed his bankers at the Capital Credit Union to start an automatic payment from Pro-Mark to BAD Investments each month for $2,500. BAD Investments is a real estate development company Berg partially owns, according to documents BAD Investments submitted to the SBA pursuant to a disaster loan application. According to bank records received pursuant to grand jury subpoenas to financial institutions, these transfers ultimately started in May 2020.

24

d.  In January 2020, Berg requested a $1 million transfer from Pro-Mark's bank
    account into the account of another company he controlled, KRB Holdings, LLC
    ("KRB Holdings").

e.  In March 2020, Pro-Mark's 401(k) provider asked Berg to review the 401(k)
    activity for the previous year, as well as the plan renewal letter. The provider
    also asked Berg to remit payment for the plan. In June 2020, the 401(k) provider
    sent a request to Berg to e-sign and file the IRS form for the year. The body of
    the email is addressed to Connie, yet she was not included as an addressee on
    the email or provided the link for e-signing.

f.  In May 2020, Berg applied for an SBA Paycheck Protection Program loan on Pro-
    Mark's behalf. The servicing bank reminded Kyle to obtain Connie's signature on
    the application.

50.     Employees openly recognized that Kyle Berg—not Connie—controlled Pro-Mark.
For example, in October 2019, Pro-Mark employee Tyler Kellen wrote to Berg and other
Pro-Mark employees regarding a change order that resulted in greater profit for Pro-Mark.
Kellen stated, "Accidentally made Kyle another $13k." Berg replied, "Tyler – You made Pro-
Mark – not Kyle!!!!!" Kellen replied, "Sorry we did it for Connie. That's what I meant to say,
computer autocorrected for some reason. Have to get IT to look into that."

51.     The Bergs sold their ownership interest in Pro-Mark to an ESOP in August 2020
for $28 million. Kyle Berg had no formal ownership role in Pro-Mark, according to
documents submitted to the SBA. Yet the investment banking advisor that handled the
ESOP transaction issued a press release dated March 2020, describing Pro-Mark as a
"general construction contractor" and referring to "Pro-Mark owners Connie and Kyle
Berg." Following the ESOP, Berg—who no longer held an executive title at the company—

appeared to remain heavily involved in managing Pro-Mark's day-to-day operations, as shown below:

    a.   In early October 2020, Berg emailed Pro-Mark employee Jason Tejral asking him to "take another stab at" drafting the past performance section of a proposal for Pro-Mark because Berg "want[ed] to make sure our proposal is one of the best one's for this contract!!!"

    b.   In late October 2020, Grant included Berg on an email to an Air Force employee, asking her to complete a past performance questionnaire for Pro-Mark. Berg followed up with Grant asking whether the Air Force employee sent the questionnaire to Ellsworth Air Force base and advising Grant to follow up accordingly.

    c.   In November 2020, Tejral sent Berg and DuBois a list of questions he planned to submit in conjunction with a request for information for a roof repair project, asking if Berg or DuBois had any questions to add to the list.

    d.   Also in November 2020, Berg handled the communications with a subcontractor for an Air Force bid, including sending the subcontractor dates for site visits and proposal due dates, and instructing the subcontractor that Pro-Mark would need a breakdown of pricing.

52.    Pro-Mark continues to actively seek and receive government contracts. Its registration in SAM was most recently renewed in August 2021 according to information from SAM.gov. It was awarded a federal contract as recently as January 2022 according to information in the Federal Procurement Data System.

53.    Given the foregoing evidence, there is a probable cause to conclude that Connie and Kyle Berg, as well as Pro-Mark, have misrepresented the extent to which Berg controls Pro-Mark. Such misrepresentations were material to the determination of whether Pro-

Mark qualified for the 8(a) and WOSB programs and therefore was eligible to receive 8(a) and WOSB set-aside contracts.

**RAZOR CONSULTING SOLUTIONS, INC. & PMR SERVICES, LLC**

54.     Razor is a computer-services company majority-owned by Carla Schwartzenberger, which participated in the SBA's 8(a) and WOSB programs. This investigation has uncovered evidence that Schwartzenberger does not actually control the business operations that perform Razor's government contracts, as required by 8(a) program requirements and WOSB requirements. Rather, Razor's government contracting services are so dependent on non-socially-disadvantaged men, namely Berg and companies controlled by Berg, including Pro-Mark, that Razor would not qualify for 8(a) or WOSB status but for material misrepresentations.

55.     According to forms that Razor filed with the SBA, Razor was incorporated under the laws of North Dakota on December 30, 2012 by Carla Schwartzenberger as 51% owner and Eric Mauch as 49% owner. Schwartzenberger and Mauch previously worked together at Microsoft, and Microsoft was Razor's primary client for several years. According to tax returns Razor filed for 2013, the company identified its business activity as "software developer."

56.     Between July 13 and October 17, 2016, Schwartzenberger completed SBA Form 1010 to apply to the 8(a) program on behalf of Razor, claiming status as an economically and socially disadvantaged individual as a Native American woman. According to its application, Razor "seeks projects including custom software design and development, business process analysis, and Business Process Outsourcing (BPO)." SBA Form 1010 contains a certification that the responses to the questions are true and complete, and an acknowledgement that the SBA is relying on the form to determine the firm's 8(a) program

eligibility. The form warns that an applicant is subject to criminal prosecution for providing false information or making misrepresentations.

57.     On January 9, 2017, the SBA accepted Razor into the 8(a) program and approved its primary NAICS code as 541519 (Computer Related Services). Schwartzenberger signed a participation agreement acknowledging that Razor risked termination if the disadvantaged individual failed to maintain full-time day-to-day management and control, as well as if Razor failed to disclose to the SBA the extent to which non-disadvantaged persons participated in the management of the business.

58.     In addition to its 8(a) status, Razor self-certified its status as a minority-owned small business and a WOSB until October 2020, when the regulation changed to no longer allow self-certification.

59.     Evidence obtained from federal agencies shows that nearly all of Razor's government contracts are in construction, maintenance, and housekeeping (which includes waste removal, pest control, and food services)—not computer services. Per 8(a) and WOSB program requirements, having the requisite management experience is one factor for determining control. Schwartzenberger has no requisite experience necessary to manage a construction, maintenance, or housekeeping company.

    a.  According to Razor's initial self-certification on SAM.gov, as of January 26, 2017, it listed a primary NAICS code of 541611 (Administrative Management and General Management Consulting Services). Among the 23 NAICS codes that Razor identified as its secondary industries, none related to construction, physical maintenance, or housekeeping services.

    b.  Schwartzenberger's resume, which she submitted with her 8(a) application to the SBA, demonstrated prior employment in software design, development, and implementation, and general bookkeeping. Eric Mauch's resume claimed

competencies in business consulting and software development. Neither resume indicated any experience, training, or licensing in construction, maintenance, or housekeeping-related services.

c.  Four months after it was accepted into the 8(a) program, in April 2017, Razor signed a mentor-protégé agreement with Pro-Mark, which was subsequently submitted to the SBA, by which terms Pro-Mark's Vice President and Business Development Manager committed to assisting Razor "to expand its core competencies and pursue new opportunities within the federal government sector." Berg signed the agreement on behalf of Pro-Mark as its Vice President.

d.  As part of the SBA's mentor-protégé program, Razor formed a number of joint ventures with Pro-Mark, including PMR Services, LLC ("PMR") in May 2018 and PMR Services II, LLC ("PMR 2") in November 2019. Under SBA rules, Pro-Mark was permitted to assist Razor with only the specific contracts governed by these joint venture agreements. Pro-Mark could assist on those contracts based on the SBA's evaluation that Razor had a need for assistance with the contract and Pro-Mark could offer valuable mentorship for the contract. Absent these joint-venture agreements, the mentor-protégé program does not provide an avenue for a mentor to assist a protégé in performing a contract.

e.  An SBA official interviewed during this investigation explained that the mentor-protégé agreement is focused on business development that benefits and assists in growing a small 8(a) company. The agreement is not meant as a contracting program, in which a large business enters the program with the purpose of winning a contract. The SBA official further explained that a mentor-protégé agreement may be problematic if a mentor found a company that had an 8(a) certification, and the mentor paired with it to use the protégé's certification to

29

win contracts. The SBA official pointed out that the program does not allow a
protégé to take on contracts that the protégé cannot self-perform or manage on
its own.

f.  While protégés are required to disclose everything they are doing to the SBA,
particularly related to ownership, assets, structure, and NAICS code, the SBA
official interviewed during this investigation noted that many business dealings
between mentors and protégés are done behind the scenes, and the SBA is
unaware of businesses operating differently from their submitted plan until it is
too late. In other words, the official said that it is possible for mentors and
protégés to submit something to meet the "letter of the law," that is, a plan that
adheres to the mentor-protégé program requirements, but not necessarily follow
that submission or to make external agreements that are not submitted for SBA
review.

g.  According to an annual review conducted by the SBA, after one year in the
mentor-protégé agreement with Pro-Mark, Razor had expanded into commercial
building construction, extermination and pest control, and landscaping services.
Those contracts were awarded solely to Razor, not to a joint venture with Pro-
Mark—meaning that Pro-Mark should not have been assisting with such
contracts.

h.  From July 2017 to at least June 2021, Razor has obtained dozens of government
contracts for a variety of construction and housekeeping related services, worth
millions of dollars.

i.  Razor has won only two contracts in its primary NAICS code 541519 (Computer
Related Services), collectively worth less than $200,000, for providing customer
service support for various Microsoft products to the National Park Service.

60.     Despite SBA rules prohibiting affiliation— determined by evaluating whether one employee exercises control over both the protégé and another small business (here, Pro-Mark)—documents obtained from the prior search warrant and government sources indicate that Berg and other non-disadvantaged, white men direct day-to-day operations and strategy of government contracts. Schwartzenberger is not involved in the day-to-day management or long-term strategy goals of Razor's government contracting arm.

61.     According to emails obtained via search warrant, Schwartzenberger's role in Razor's government contracts is limited to submitting paperwork where her signature is required and some tracking of accounts payable and receivable. Also according to emails obtained via search warrant, Schwartzenberger defers to Pro-Mark employees' instructions regarding performing government contracting work. For example, Pro-Mark employee Tyler Kellen indicated that Pro-Mark "basically do[es] all the work for Razor when it comes to the construction side," and Razor doesn't "know how to do anything," leading to Kellen stating that he spent at least 25 hours per week on Razor projects, while Razor employees "spend 0" hours per week on the construction projects. In response, Pro-Mark employee Mandy Grant provided, "We all work for Pro-Mark so if we all work together we can help each other out and hopefully ease work loads for everyone. . ."

62.     Schwartzenberger is not meaningfully involved in the day-to-day management relating to Razor's government contracts. Perius (Razor's government contracts employee and a man) emails Berg and Pro-Mark employees extensively and defers to their judgment about the day-to-day managing of government contracts, according to emails obtained via search warrant.

    a.     In February 2020, Berg emailed Mauch, Kellen, and Perius at their Razor email addresses, asking if Razor had any luck advertising a position for a Project

Manager and if "we" still have the ad out. Berg pointed out that Kellen could not handle more Razor work and needed to concentrate on his Pro-Mark work.

b.   In March 2020, a GSA government employee circulated a contact list for contractors working on the project to renovate the federal courthouse, a contract awarded solely to Razor. The list included Kellen, Grant, and Perius. It did not include Carla Schwartzenberger.

c.   In April 2020, Kellen emailed Berg, explaining that Razor did not know how to send invoices for government contracts and saying "I don't think Razor billing is all that similar to this anyways." Kellen then stated that he would create the invoices to send to the government on behalf of Razor for contracts that, according to government records, were awarded solely to Razor.

d.   In July 2020, an official with the Air Force contacted Schwartzenberger, Mauch, and Perius to schedule a time to discuss a potential $4 million sole-source contract to Razor. Perius forwarded the scheduling request to Berg, Grant, and Jason Tejral, a Pro-Mark employee. Schwartzenberger appears to have never responded. After Berg and Grant provided their availability, Mauch commented that he had more limited availability and "will defer to Darin/Mandy/Kyle."

e.   In August 2020, Tejral collected quotes from subcontractors for a contract bid by Razor. Tejral told the subcontractors that a Pro-Mark employee would be the point of contact for the project, and he further directed the subcontractors to cc: Tejral on all correspondence. Tejral did not mention Razor as the prime contractor or provide any contact information for any Razor employee.

f.   In September 2020, Tejral sent quotes from subcontractors to Perius so that Perius could provide the quotes to the Air Force on behalf of Razor.

32

g.  Razor maintains an email account, razorgov@gotorazor.com, that is used to receive communications from government contracting officers. The account apparently automatically forwards emails to Berg, Grant, and Pietruszewski at their Pro-Mark email address. For example, in January 2020, the SBA notified Razor employees that Razor won a contract for renovation. A Razor employee forwarded the email to razorgov@gotorazor.com. Berg responded from his Pro-Mark email address, "Perfect."

h.  At times, Grant manages the razorgov@gotorazor.com email address. In April 2020, Grant used the razorgov@gotorazor.com email address (according to the email signature block) to submit a bid solely from Razor to Indian Health Services for a construction project. A government employee replied, requesting additional information about a subcontractor. The email was forwarded from razorgov@gotorazor.com to Berg and Pietruszewski at their Pro-Mark email addresses—not to Schwartzenberger—seeking their input.

i.  In August 2020, Grant, again using the razorgov@gotorazor.com email address according to the signature block, sent a government contracting officer at Indian Health Services an email, attaching a signed copy of Form SF1413, which identified subcontractors used on a project awarded to Razor. Grant explained that Pro-Mark was not a subcontractor on the project. A subsequent email from the razorgov@gotorazor.com address told Indian Health Services officials that "we" will review the project facility, order construction materials, and create a project schedule. In another string of the email, Pietruszewski—a Pro-Mark employee—claimed to have written the "we" email on behalf of razorgov@gotorazor.com. Pietruszewski explained to Pro-Mark employee Will Klinke, a project manager Pro-Mark hired to work on PMR Services and Razor-

related projects, that Pietruszewski had written the email regarding materials
and scheduling from the razorgov@gotorazor.com email address.
Schwartzenberger does not appear to respond to any of the 79 emails as part of
this conversation chain regarding Razor's contract with Indian Health Services,
which were identified through computer analysis.

63.    Non-disadvantaged, white men—not Schwartzenberger, despite representations
to the contrary—determine staffing to Razor's government contracting work, according to a
review of emails obtained via search warrant.

    a.   For example, in November 2018, Berg emailed Daniel Walters, who owns
MDM—an SDVOSB over which Berg exercises impermissible control (as detailed
below in Paragraphs 78-88)—regarding employee Tammy Stavenes. At the time,
Stavenes was working for Pro-Mark, and Berg wanted to determine how to share
her across multiple companies. Berg commented "I would think she could make
me more money running other projects for either Pro-Mark, Tunheim, Razor, or
OK2 Construction. With . . . Razor (CBP project) she should stay pretty busy."

    b.   In September 2018, Schwartzenberger received a purchase order from a
government contracting official for a contract awarded to Razor by the U.S.
Customs and Border Protection. Schwartzenberger forwarded the email to
Stavenes asking what the purchase order was for. Stavenes replied, explaining
that Razor was awarded a contract by the U.S. Customs and Border Protection.
Stavenes said she would check with Grant to see "who is going to do the
contracts." Grant later received the email communication and forwarded it to
Berg.

c.  In May 2019, Stavenes sent a bid to Customs and Border Protection for lawn mowing services, using her Razor email account. She copied Berg at his Pro-Mark address.

d.  In September 2019, Schwartzenberger forwarded an email chain regarding Razor's contract to renovate the federal courthouse to Kellen at his Pro-Mark email address. In response, Kellen emailed Razor employees that a Pro-Mark superintendent would handle the project, and he copied Berg on the email. Berg replied confirming that plan.

e.  In October 2019, Berg used his Fed Serve email account to email a painting subcontractor to confirm a contract for a project awarded to PMR Services. Berg explained to the subcontractor,

> Sorry I didn't explain the arrangement with PMR JV (Pro-Mark/Razor). Since we graduated from the 8a program and Pro-Mark is too large for the painting size standard we have an approved Mentor Protégé Agreement with them through the SBA. We are working on our 2nd JV with them. They are an 8a/women owned firm . . . I also know one of the owners pretty well."

f.  In February 2020, Berg used his Pro-Mark email address to email Schwartzenberger to inform her that Pro-Mark would invoice Razor and PMR for work that Pro-Mark employee Tyler Kellen spent on Razor or PMR projects, including the project for renovations at the federal courthouse.

g.  In March 2020, Razor employees Mauch, Perius, and Beer discussed an interview for a job candidate for a project manager for Razor. Schwartzenberger was not included in the email communications. Mauch forwarded the email chain to DuBois and Berg at their Pro-Mark email addresses and asked for feedback. DuBois responded, saying "Ultimately up to you and Kyle."

h. In July 2020, Berg emailed Grant using their Pro-Mark email addresses to ask what additional information Grant needed to submit a bid to the government on behalf of Razor. Grant replied that "we" need to include resumes of "our" key personnel, as well as descriptions of performance on past contracts. Grant reminded Berg, "Remember this has to be on Razor[.]"

i. In July 2020, Grant, using her Pro-Mark email address, emailed Schwartzenberger, Mauch, and others at Razor and copied Berg at his Fed Serve email address. Grant announced that Pro-Mark employee Tyler Walker would bid a project on behalf of Razor for the National Park Service. Grant explained that she would put the bid package together, "but if someone from [R]azor could email it in the day it's due that would be great." Mauch replied to confirm that Razor would submit it. Later in the email chain, Walker provided the names of the only two employees assigned to the project. According to other Pro-Mark internal emails from 2020, both of those employees had a Pro-Mark email address, reported their working hours to Pro-Mark, and received company credit cards from Pro-Mark. Schwartzenberger does not appear to have responded to any of these email communications.

j. In August 2020, Berg emailed Schwartzenberger, Mauch, and Perius at their Razor email addresses and Grant at her Pro-Mark email address to introduce a new project manager, Will Klinke, who would be in "our" office "strictly working on PMR/Razor projects." Berg said Klinke would work on "Bismarck" and "Eagle Butte" unless Razor had a project manager before work began. According to contract files of the government, "Bismarck" and "Eagle Butte" refer to a contract for construction projects for the Indian Health Services agency awarded solely to Razor on account of its 8(a) status.

36

    k.  In February 2020, Kellen used his Razor email address to email a co-worker, and complained about Berg assigning him to Razor. Kellen later continued, ". . .[I] wanted to do a good job and make him [i.e., Berg] money." Kellen also referenced that Mandy Grant and Chad DuBois (who are employed by Pro-Mark) control his time clock and direct deposit of his paycheck.

64.    Pro-Mark employees represent themselves as Razor employees to government contracting officers, according to emails obtained from government agencies and from the search warrant, as shown below. An SBA official interviewed during this investigation said that she would be concerned about fraud if a mentor's employees had email addresses and signature blocks from the protégé's company and used them to send emails to government contracting officers.

    a.  As of 2020, Kellen represented himself as working as a project manager for both Pro-Mark and Razor per his email addresses for each company.

    b.  As of 2020, Grant represented herself as working for both Pro-Mark and Razor per her email signature and use of the email address razorgov@gotorazor.com.

    c.  As of 2020, Pietruszewski emailed government officials on behalf of Razor from the email address razorgov@gotorazor.com.

    d.  From at least September 2018 to October 2019, Stavenes, who was at the time was paid by Pro-Mark, was working for both Pro-Mark and Razor per her email addresses for each company.

65.    Evidence contained in emails obtained from the prior search warrant to Microsoft shows that Razor shares profits with Pro-Mark on government set-aside contracts awarded solely to Razor for construction, maintenance, and housekeeping.

    a.  In June 2019, November 2019, January 2020, April 2020, and July 2020, Schwartzenberger emailed quarterly reports to Berg, DuBois, and Grant listing

profits and losses for contracts that the government awarded solely to Razor. The statements show that Razor owed 49% of net income on the contracts to Pro-Mark.

b. In April 2020, Berg emailed Grant and Kellen at their Pro-Mark email addresses to clarify how much to bill to Razor for contracts at the federal courthouse, which according to the contract records of the government, were awarded solely to Razor on account of its 8(a) status.

66.     Given the foregoing evidence, there is probable cause to conclude that Razor misrepresents who controls Razor's government contracting business and the extent to which Razor is influenced by and dependent on businesses controlled by Berg, such as Pro-Mark. Such misrepresentations were material to the determination of whether Razor qualified as owned and controlled by a disadvantaged individual or woman, and therefore was eligible to receive 8(a) or WOSB set-aside contracts.

**FED SERVE, LLC**

67.     Fed Serve is a general contracting company 100% owned by Berg that has been certified as a HUBZone small business. Evidence establishes, however, that Fed Serve affirmatively misrepresents to the SBA that it meets HUBZone requirements when, in fact (1) its actual principal office location is not in a HUBZone; (2) it does not meet the requirements to employ individuals residing in a HUBZone; and (3) it has undisclosed affiliations with Berg's other businesses such that Fed Serve likely does not qualify as a "small" business for set-aside contracts, but for these material omissions.

68.     Fed Serve was incorporated in March 2017 under the laws of North Dakota, according to state records. On the SBA's website, Fed Serve's experience is listed as follows: construction and remodeling, maintenance, housing, concrete, excavation, painting, roofing, and remodeling. The SBA certified Fed Serve as a HUBZone small business in February

2019. When Berg electronically verified the HUBZone application for Fed Serve, he certified to the SBA that Fed Serve complied with all HUBZone eligibility requirements, including the principal office requirement and that no material change in HUBZone employee percentage occurred since the time the business was certified as a HUBZone.

69.     Similarly, according to government records of bid submissions, each bid submitted on behalf of Fed Serve generally required Berg to submit a representation certifying Fed Serve's size for the relevant NAICS code. These representations were submitted under warning that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. By virtue of its set-aside status, Fed Serve has received numerous government contracts, including from the Air Force and the Army, totaling millions of dollars.

70.     This investigation, however, has uncovered evidence that Fed Serve misrepresented the location of its principal office as being in a HUBZone. SBA regulations require that a HUBZone business's principal office location be located in the HUBZone; "principal" is defined as "the place where the greatest number of employees perform their work." In his verification to the SBA, Berg listed Fed Serve's principal address as 3950 25th St. N Fargo, North Dakota 58102, which falls within a qualified HUBZone, as demonstrated by the screenshot of the SBA's official HUBZone map, included for reference below (the HUBZone-qualified area is indicated in gray). Evidence indicates that this is not Fed Serve's principal place of business. Rather, Berg runs Fed Serve out of his other business locations, none of which are located in the HUBZone, as demonstrated below.





a.  According to documentation that Berg submitted to the SBA to certify Fed Serve
    as a HUBZone business, Fed Serve's purported principal address, 3950 25th St.
    N Fargo, North Dakota 58102, is 600 square feet of office space that Berg rents
    within a commercial building owned by Tunheim Holdings, LLC for $450 per
    month. Tunheim Holdings also owns Tunheim Construction – an 8(a) entity with
    which Pro-Mark has a mentor-protégé agreement, according to a contracting
    officer with GSA.

b.  As further detailed below, the wages for Fed Serve's sole claimed employee (other
    than Berg) from May 2018 through August 2020, Anthony Luchsinger, appear to
    have been reimbursed, at least in part, by Tunheim Construction, raising a
    question as to whether Luchsinger was a legitimate Fed Serve employee

40

performing any work for the company or whether Fed Serve claimed him as an

employee for the purpose of establishing the company's purported principal

office.

c. In an August 2019 email, Berg told a group of social acquaintances to meet "at

Fed Serve Office: 3271 Oak Ridge Loop E West Fargo." This is the address of

another business represented by Kyle Berg—a real estate company, KRB

Holdings—which leased this location to OK2 in March 2019, according to a lease

agreement submitted to the CVE pursuant to OK2's reverification process as an

SDVOSB in 2019. This address is not in the HUBZone, according to the SBA's

official HUBZone map.

d. On April 14, 2020, Berg also listed Fed Serve's address as 3247 Oak Ridge Loop

E on Fed Serve's Paycheck Protection Program loan application promissory note,

which he submitted to the SBA.

e. A review of criminal mail cover request results covering November 22, 2021

through November 29, 2021 and December 2, 2021 through December 14, 2021

indicate that neither Fed Serve nor Berg received mail at 3950 25th St. N Fargo,

North Dakota 58102, Fed Serve's purported principal address. Mail sent to that

address during that period was addressed to Tunheim Construction, various

members of the Tunheim family (e.g., Gabby Tunheim,  Gayelynn Tunheim, and

Christopher Tunheim), and other individuals and businesses unrelated to Fed

Serve or Berg.

f. A review of criminal mail cover request results from dates in September 2020,

August 2020, and April 2021 indicate that Fed Serve receives mail at 3271 Oak

Ridge Loop E., West Fargo, North Dakota 58078, which is OK2's address,

according to a lease submitted to the CVE during OK2's reverification process;

3275 Oak Ridge Loop E., West Fargo, North Dakota 58078, which is Pro-Mark's address, according to government contracts awarded to Pro-Mark; and 5012 2nd St. E., West Fargo, North Dakota 58078, which is the Berg's home address, according to surveillance and state records.

g.  A review of criminal mail cover request results also indicated that in December 2021, Fed Serve sent mail to Tunheim Construction at the 3950 25th St. N Fargo address, Fed Serve's own purported address.  Fed Serve's return address on the mail was the Berg's home address.

71.  Documents indicate that Fed Serve falsely represents that 35% of its employees live in the HUBZone. Fed Serve kept at least one employee on its payroll (Luchsinger) to make it appear that he worked for Fed Serve, when, in fact, another company was reimbursing Fed Serve for the employee's wages. When that employee moved out of the HUBZone, Fed Serve hired Berg and Chad DuBois's college-aged children to satisfy the HUBZone residency requirement, as explained below.

a.  In documents submitted to the SBA pursuant to the HUBZone-certification process, Berg listed Luchsinger as the only Fed Serve employee, besides himself, and indicated that Luchsinger worked 40 hours per month for Fed Serve. Luchsinger's pay stubs, which Berg also submitted to the SBA, listed Luchsinger's address as 555 40th St. S. 236, Fargo, North Dakota 58103, which is located within a HUBZone, according to the SBA's official HUBZone map.

b.  Payroll records for Fed Serve obtained via grand jury subpoena indicate that the only employee Fed Serve paid from January 1, 2019 through August 24, 2020 was Luchsinger.

c.  Although Fed Serve represented that it employed Luchsinger, Tunheim Construction—not Fed Serve—paid Luchsinger's wages, at least for a portion of

the period he was employed by Fed Serve. According to an email obtained via the prior search warrant to Microsoft, in September 2019, Berg asked his external accountants, Denise and Jason Luther, to "add up Tony's wages thru August 2018 for what Fed Serve has paid Tony. I need to send Chris an invoice for this amount so I can clean it up." In the email, Berg appears to be referring to Chris Tunheim, the ultimate owner of Tunheim Construction.

d.  During this time, evidence shows that Luchsinger was also an employee of Tunheim Construction. According to Tunheim's payroll records, Luchsinger was receiving his regular paychecks from Tunheim for the entire time that Fed Serve was claiming him as an employee. Additionally, Luchsinger had a business email address with the Tunheim Construction account, according to emails obtained via the prior search warrant to Microsoft. According to a review of emails available from a search of the Fed Serve email account, Luchsinger did not have a Fed Serve business email address. Moreover, Tunheim Construction affirmatively represented Luchsinger as an employee; for example, Tunheim Construction listed him as an employee on an Entry Authorization List Request submitted to the Minot Air Force Base in March 2020.

e.  According to payroll records, Fed Serve's last paycheck to Luchsinger was on August 31, 2020. According to payroll records, until August 24, 2020, Luchsinger was the only employee Fed Serve was paying (other than Kyle Berg). Per an email obtained via the prior search warrant to Microsoft, sometime around this time, Luchsinger moved out of the HUBZone. On September 2, 2020, Berg wrote, "Tony will be moving out of the HUBZone so this will be his last week he will receive a check. Let's put Scott (current Pro-Mark employee) on Fed Serve payroll." (Later emails from Berg indicated that "Scott" was not moved to Fed

43

Serve's payroll and stopped working for both Pro-Mark and Fed Serve for reasons that are unclear.)

f.   According to payroll records from January 8, 2019 through June 14, 2021,  Fed Serve's only employees, other than Luchsinger and Berg, were Berg's sons— college-enrolled Blake and minor Evan Berg—and Chad DuBois's college-enrolled daughter—Paige DuBois. According to Fed Serve's payroll records, Fed Serve put Blake and Evan on the company's payroll on August 31, 2020 and Paige on the company's payroll on  September 14, 2020. As detailed below, Paige lived in a HUBZone and Blake potentially lived in HUBZones: claiming Paige and Blake as employees allowed Fed Serve to maintain the requirement that 35% of employees reside in a HUBZone.

g.   Less than a week after Luchsinger moved out of the HUBZone, on September 9, 2020, DuBois emailed Berg, a copy of the residential lease of his 21-year-old college-enrolled daughter, Paige. DuBois wrote, "This is Paiges lease. Let me know if it works." Berg replies, "Yep – dead center of the HUBZone." According to additional email correspondence from Berg, Fed Serve appears to have hired Paige for 10 hours per week at minimum wage shortly thereafter. Payroll records show Fed Serve paid Paige from September 14, 2020 through at least June 14, 2021.

h.   Berg represented his college-enrolled son, Blake, as a Fed Serve employee in his application to the SBA for a Paycheck Protection Program loan. According to payroll records, Fed Serve paid Blake from August 31, 2020 through at least June 14, 2021. According to emails obtained from the search warrant, Blake was enrolled as a student at St. John's University (located in Collegeville, Minnesota) and living in or near Collegeville, Minnesota, during this time. Collegeville,

Minnesota is a two-and-a-half-hour drive from Fed Serve's location in Fargo, but it directly borders a HUBZone, as indicated in the below screenshot from the SBA's official HUBZone map. If Blake lived in a HUBZone while enrolled in college, he would qualify for the 35% HUBZone residency requirement.



72.    Evidence also indicates that Fed Serve intentionally tried to avoid an appearance of affiliation with other companies, despite extensive connections with Berg's other businesses, primarily Pro-Mark and MDM. These connections include financial support and shared employees, which were not disclosed to the SBA. This level of dependency on and connection with other companies likely qualifies as an undisclosed affiliation with those companies. An undisclosed affiliation—particularly where the affiliated business does not qualify as "small" under the relevant NAICS code—is a material misrepresentation to the SBA. For example, Berg omitted disclosure of Fed Serve's potential affiliations in a discussion with an SBA official in February 2019. At the time, Berg was in the process of certifying Fed Serve as HUBZone-eligible. He inquired what the SBA would need "for affiliated info," noting that he was "trying to do everything so there is no affiliation." In response, the Business Opportunity Specialist explained, "If there isn't an affiliation I don't

need anything – I just check the NO box." Berg did not further clarify or address why he was concerned about affiliation. On Fed Serve's HUBZone application, Berg did not disclose any affiliations. In subsequent certifications submitted pursuant to government contracts, Berg affirmatively represented Fed Serve as a HUBZone-eligible small business concern, which is defined in these representations as "a concern, including its affiliates, that…qualified as a small business under the criteria in 13 CFR Part 121 and size standards in this solicitation."

73.     Documents obtained from Pro-Mark and Fed Serve indicate that employees marketed Fed Serve and Pro-Mark as interchangeable companies. Employees offered Fed Serve as an alternative to Pro-Mark, when Pro-Mark would not qualify for the contracting opportunity based on the small business size corresponding to the NAICS code, as shown in the following examples of emails obtained through the Microsoft search warrant:

a.   In April 2017, a GSA contracting specialist emailed Berg and Mandy Grant, Pro-Mark's then-office manager, noting that the bids he received from Pro-Mark and Fed Serve contained the same offer amount. The contracting specialist stated that he was aware that Berg was affiliated with both companies. Berg replied "Pro-Mark does not meet size standard so that should not have been sent in. Fed Serve bid it due [to] this so Pro-Mark pricing should be removed from competition."

b.   In August 2019, a representative from the U.S. Department of Agriculture emailed a Pro-Mark employee a request for a small business set-aside contract to paint a stairway. The Pro-Mark employee responded that, while Pro-Mark was not small enough to take the job, Fed Serve provided "an avenue to award this work." The employee further noted, "My boss Kyle owns this company and it would still be us doing the work."

46

    c.  On numerous occasions in 2019 and 2020, Pro-Mark employees decided to use Fed Serve to bid a given contract, according to emails, because the size of the contract rendered Pro-Mark ineligible to bid, including on contracts for the Air Force and the U.S. Department of Agriculture. For example, in June 2020, Mandy Grant used her Pro-Mark email address to send a contracting opportunity from the Air Force for NAICS Code 238330 (Flooring Contractors) to Chad DuBois, at his Pro-Mark email address, and Berg at his Fed Serve email address. She wrote, "Would have to bid under Fed Serve due to size $15M."

74.    Evidence indicates that Pro-Mark provided undisclosed financial support to Fed Serve. Beginning in January 2019, Pro-Mark made automated monthly payments to Fed Serve of $15,000 per month, according to an email obtained through the search warrant to Microsoft and confirmed by bank records obtained through a grand jury subpoena.

75.    Pro-Mark and Fed Serve freely shared employees and resources and did not distinguish between employees of one company or another, as demonstrated in internal emails obtained through the search warrant to Microsoft.

    a.  In September 2019, Grant asked how Berg wanted to handle a Fed Serve project from the U.S. Department of Agriculture. Berg replied, "Dan Noyes will be doing this as a Pro-Mark employee. We will have to do cert payrolls for him." Fed Serve has never paid Noyes, according to Fed Serve's payroll records obtained via grand jury subpoena; Pro-Mark, however, paid Noyes just over $2,000 in September 2019, according to Pro-Mark's payroll records obtained via grand jury subpoena.

    b.  In September 2020, a contracting officer from the U.S. Department of Agriculture emailed Berg requesting a proposal from Fed Serve. Berg emailed Pro-Mark employee Will Klinke at his Pro-Mark email address, asking him to

complete the documents. Klinke completed the proposal and then asked Berg to

forward them on "under the FedServe [sic] email." Fed Serve has never paid

Klinke, according to Fed Serve's payroll records; yet Pro-Mark paid Klinke

approximately $4,800 in September 2020, according to Pro-Mark's payroll

records.

c.   In April 2020, Pro-Mark employee Jason Tejral sent a list of employees who had

base passes to a contracting officer for Offutt Air Force Base. Tejral stated that

the eight employees were from "Pro-Mark Services/Fed Serve," with no

distinction between which employee worked for what entity. Other than Berg,

none of these employees ever received compensation from Fed Serve, according to

Fed Serve's payrolls records.

d.   As of 2020, Tyler Kellen represented himself as a project manager for both Pro-

Mark and Fed Serve per his email signature and email account for each

company. According to Fed Serve's payroll records, the company has never paid

Kellen; according to Pro-Mark's payroll records, in 2020, Pro-Mark paid Kellen

over $60,000.

e.   Mandy Grant performed work for Fed Serve, in addition to the work she was

doing for Pro-Mark and OK2. For example, emails obtained in the prior search

warrant show that she submitted numerous bids to GSA in 2017 on behalf of Fed

Serve, assisted in completing experience questionnaires for contracting

opportunities in May 2020, ordered bid bonds in July 2020, and prepared

indemnities in September 2020. Fed Serve's payroll records indicate that Fed

Serve has never paid Grant.

f.   In a bid submitted to the National Park Services in May 2020, Berg claimed Pro-

Mark employees Grant and Tyler Walker as Fed Serve employees. Fed Serve's

quarterly federal tax returns for this period, which Fed Serve submitted to the SBA for a Paycheck Protection Program loan, listed neither Grant nor Walker as employees; Fed Serve's payroll records indicate that Fed Serve has never paid Walker.

g. In August 2020, Berg emailed Grant and Chad DuBois—Pro-Mark employees— asking them to "move the employee that failed his drug test to Fed Serve payroll just in case something happens down the road." Fed Serve's quarterly federal tax returns for this period, which Fed Serve submitted to the SBA for a Paycheck Protection Program loan, listed neither DuBois nor Grant as employees; Fed Serve's payroll records indicate that Fed Serve has never paid DuBois or Grant, despite Berg apparently asking DuBois and Grant to assist in managing Fed Serve's payroll.

h. In September 2020, in an attempt to secure health insurance through Fed Serve, Berg suggested putting a current Pro-Mark employee on Fed Serve's payroll to meet the requirements for health insurance that Fed Serve have two W-2 employees.

76.    As discussed in more detail below, starting at Paragraph 78, MDM is a company owned by Daniel Walters that has been certified as an SDVOSB. Evidence establishes, however, that Berg exercises impermissible control over MDM. Documents obtained from Fed Serve and MDM indicate that MDM and Fed Serve share profits and MDM provides financial support to Fed Serve, as demonstrated below:

a. In October 2019, an MDM employee emailed Chad DuBois and Berg asking if the profit payments MDM had made to Fed Serve to date matched their records. Per this email, MDM made a profit payment of $64,000 to Fed Serve relating to a project at an Air Force base.

49

b.   Starting in November 2019, MDM began paying Fed Serve $10,000 per month

for "Profession Fees."

77.    Fed Serve continues to actively seek and receive government contracts.  Its

registration in SAM was most recently renewed in June 2021 according to information from

SAM.gov.  It was awarded a federal contract as recently as January 2022 according to

information in the Federal Procurement Data System.

78.    Given the foregoing evidence, there is probable cause to conclude that Fed Serve

and Berg have misrepresented Fed Serve's eligibility as a HUBZone small business,

including its principal office location, its employees who live within the HUBZone, and its

affiliations with other entities controlled by Berg such as Pro-Mark. Such

misrepresentations were material to the determination of whether Fed Serve was eligible

for HUBZone certification and therefore was eligible to receive HUBZone and small-

business set-aside contracts.

**MDM CONSTRUCTION, LLC**

79.    MDM is a company owned by Daniel Walters that has been certified as an

SDVOSB. Evidence establishes that, contrary to Walters's representations to CVE, MDM is

entwined with and so dependent on companies controlled by Berg, including Pro-Mark and

Fed Serve, that MDM likely would not qualify as an SDVOSB but for the material

misrepresentations.

80.    According to state documents submitted to the VA, MDM was organized under

the laws of North Dakota in 2009. Walters, who claims service-disabled veteran status, was

its organizer and registered agent. In 2011, 2013, 2015, and 2018, Walters filed VA forms

0877 affirming that he owned 100% of MDM and that "at least 51% of the business is owned

and controlled . . . by Veterans or service-disabled Veterans." MDM was first certified as an

SDVOSB in 2011 and has been recertified several times since. For example, in 2018, CVE

personnel concluded that based on the information provided by MDM, there was no indication that MDM was unduly influenced or dependent on any non-veteran or entity. By virtue of its set-aside status, MDM has received numerous government contracts from the VA, Air Force, and other agencies totaling millions of dollars.

81.     This investigation, however, has uncovered evidence that MDM does not qualify as controlled by Walters because of its extensive connections and dependency on Berg and Pro-Mark. These connections have not been disclosed to CVE. A CVE official interviewed during this investigation indicated that reliance on another business, potentially shown through the sharing of personnel, equipment, or management, would make it unlikely a company could be certified as an SDVOSB.

82.     According to his resume submitted to the VA, prior to MDM, Walters worked as a Construction Project Manager at CS DuBois from March to June 2008. Kyle Berg also worked at CS DuBois at the time Walters worked there and Chad DuBois was its owner, according to a resume submitted by Berg to the VA in the context of his ownership in OK2 and information submitted to the SBA. CS DuBois was previously enrolled in the SBA's 8(a) program and graduated in 2007. Following CS DuBois, Walters worked at Pro-Mark as a Construction Project Manager from June 2008 until July 2009, around the time he incorporated MDM.

83.     Documents obtained via search warrant from Pro-Mark and Berg's company Fed Serve indicate that MDM not only subcontracted work to Pro-Mark and Fed Serve but also bid projects in conjunction with them, shared access to business records with them, and shared profits with them:

    a.   In June 2019, Berg, who was not an owner of MDM and was not on its payroll, requested from MDM's external accountant, Jason Luther, (who also serves as the accountant for Pro-Mark and Fed Serve,) that he send MDM's first quarter

in-house financials to Berg. Walters was copied on the email and in response told the accountant that he should have all the information needed to provide them.

b.   Later in June, Berg, Walters, Mandy Grant, then Pro-Mark's office manager, and Kari Hazer, who performed office and bookkeeping functions for MDM, discussed a set of projects that Pro-Mark and MDM were working on. Berg wrote that "I assume we (Pro-Mark) will be bidding and you (MDM) will be putting proposals together?" Walters confirmed that MDM could prepare the proposals.

c.   In a July 2019 email, Berg and Walters apparently agreed that Pro-Mark and MDM would split the payment for supervising a VA contract. MDM subsequently sent Pro-Mark a subcontract for the project.

d.   In October 2019, Hazer emailed Berg and Chad DuBois, then a vice president of Pro-Mark, that MDM had made "payments for profit" approximately $114,000 to Pro-Mark and $64,000 to Fed Serve relating to a project at an Air Force base.

e.   In November 2019, Hazer emailed MDM's external accountant, Luther, and asked him to set up a recurring monthly payment of $10,000 from MDM to Fed Serve for "Profession Fees." In an email relating to the monthly payments, Berg joked "[t]his is just to buy some additional friendship for a long period of time!!!"

f.   In May 2020, Walters sent Berg and DuBois a report of MDM profits for work on three contracts awarded to MDM at an Air Force base and offered to send Pro-Mark a check at the end of the second quarter when the amount would be larger.

84.   Evidence also indicates that MDM and Pro-Mark freely shared employees and resources, and frequently did not distinguish between assets and employees of one company or the other, as demonstrated in internal emails obtained through the search warrant to Microsoft. At times, Pro-Mark and MDM apparently shared or freely transferred several employees between them, as shown below:

a.  In July 2018, DuBois emailed Berg a list of employees who should have access to project management software used by Pro-Mark. The list was titled "employeelist" and included Walters and Hazer of MDM. DuBois subsequently sent the list to the software vendor, representing it as a list of Pro-Mark employees who needed access to the software.

b.  In November 2018, Berg emailed Walters regarding one employee, Tammy Stavenes, to determine how Pro-Mark and MDM could split her cost fairly.

c.  In June 2019, another employee, Larry Peihl, used a signature block in his emails sent from an MDM domain indicating that he was a superintendent for "Pro-Mark Services Inc/MDM Const." Payroll records indicate that Peihl was paid by Pro-Mark until January 2019, when he began to be paid only by MDM.

d.  Later in June, Hazer informed a U.S. Department of Agriculture contracting officer that two Pro-Mark employees would attend a bid meeting on behalf of MDM. In response to Hazer's email, one of the Pro-Mark employees emailed to ask Walters and Berg for help on how they should represent their relationship with MDM to the agency.

e.  In August 2019, Berg emailed Walters and Hazer, among others, to discuss moving Pro-Mark employee Dave Dietrich to work for MDM. Berg asked whether Dietrich should continue to use his Pro-Mark credit card for the time being and requested confirmation that Dietrich would receive the same pay and benefits. Hazer responded that the benefits should be roughly the same, as they were for two Pro-Mark employees who had apparently joined MDM earlier, including Peihl. Walters responded that they would do whatever they needed to do to equalize Dietrich's current benefits.

f.  In September 2019, Walters asked Pro-Mark personnel including Berg and
DuBois whether a Pro-Mark employee, Melanie Foley, who would be doing work
on an MDM project, could be put on the MDM payroll. Walters pointed out it
"[h]elps us get our percentage" and MDM would likely take her for a later project
anyway. By percentage, Walters may have meant the percentage of work the
prime contractor was required to do on a contract per certain government
contracting requirements. DuBois indicated that she could not change to MDM's
payroll because she was receiving Pro-Mark health insurance.

g.  In October 2019, Hazer, DuBois, Berg, and Walters emailed with Luther, MDM
and Pro-Mark's accountant, to facilitate the transfer of Pro-Mark employees
Foley and Stavenes from Pro-Mark's payroll to MDM's.

h.  In a separate discussion later in the month, DuBois, Berg, and Walters agreed
that Pro-Mark would transfer the vehicle Stavenes was using for work to MDM
for $10,000.

85.  Evidence from documents submitted by MDM to CVE and emails obtained from
the prior search warrant indicates that MDM used facilities and paid rent to a company
owned in part by Berg and may have shared those facilities with Pro-Mark. MDM appears
to have been concerned that the close connection between its facilities and Berg and Pro-
Mark would have been viewed as dependency and a potential problem by CVE. For
example:

a.  MDM submitted documents to CVE indicating that beginning in February 2019,
it leased 3,500 square feet in a property at 2215 Sheyenne Street in West Fargo,
for a term of three years from Marlin Creek Holdings, at a rent of $2,000 per
month. Tax records submitted to the SBA indicate that Marlin Creek Holdings is
50% owned by Walters and 50% owned by Berg. Berg signed the lease on behalf

of Marlin Creek Holdings. In a March 2019 letter to CVE Walters confirmed that MDM had paid Marlin Creek Holdings rent starting in February 2019.

b.  MDM also submitted documents to CVE indicating that it signed a subsequent lease for the same property, 2215 Sheyenne Street, with DJW Holdings LLC ("DJW"). The lease dated October 1, 2019 was for the same 3,500 square feet, now for a monthly rent of $2,250. The term was three years. In a March 2017 interview with a CVE examiner, Walters had reported he was the 100% owner of DJW. Local assessor records confirm that DJW purchased the property in 2017.

c.  Based on the above, it appears that MDM and Walters were paying Marlin Creek Holdings, part owned by Berg, rent for a property that Marlin Creek Holdings did not own and was in fact owned by DJW, a company wholly owned by Walters.

d.  In addition, beginning in July 2019, MDM subsequently rented 1,500 square feet in a property at 2261 Sheyenne Street, down the street from its office at 2215 Sheyenne Street, in West Fargo from Marlin Creek Holdings. The lease had a term of five years and monthly rent of $2,500.

e.  Emails indicate that Marlin Creek paid Pro-Mark for construction work; Marlin Creek Holdings paid Pro-Mark approximately $229,000 in May 2019.

f.  In a series of emails from October 2019, Walters told Berg that a contractor working on behalf of the VA had stopped by the MDM offices. Berg expressed concern, and Walters explained that the contractor "[a]sked why we were sub leasing an office to someone (Mandy) I don't think it was a big thing. There were no PM stuff around." The email appeared to indicate that MDM was allowing Mandy Grant, at the time the secretary and treasurer of Pro-Mark, to use its space and that there was frequently Pro-Mark "stuff" in MDM's offices.

g. In emails from April and May 2020, Pro-Mark and MDM personnel discussed switching offices, indicating that MDM had swapped from 2215 Sheyenne to 2261 Sheyenne and Pro-Mark had taken over the 2215 Sheyenne space. In one email Walters asked Grant to confirm when Pro-Mark had changed its address on government sites because he did not "wont [sic] both of us to pop up with the same address."

86.    In the fall of 2019, Walters and Berg attempted to sell a portion of MDM to Berg, but rescinded the deal when CVE asked a number of questions about Berg's other interests, which raised questions about potential affiliation.

a. In October 2019, MDM submitted a bill of sale to CVE indicating that Walters had sold 49% of MDM to Berg for $1.5 million.

b. In conjunction with the sale, MDM submitted documentation to CVE showing the change in ownership. Walters submitted a VA form 0877 certifying that he was now a 51% owner of MDM but that the company continued to be at least 51% owned and controlled by a service-disabled veteran.

c. MDM also submitted a resume to CVE for Berg showing that he was the owner of Fed Serve but misrepresented that his involvement in Pro-Mark had ended in December 2018. Previously in July 2019, Berg had emailed Pro-Mark employees to tell them that DuBois had taken over his role as vice president of Pro-Mark. Berg wrote, "I'm not going anywhere but will be more in the background and more of a 'Business Development Consultant' sort of speak. More of the day to day will be done by Chad. I'm involved with different entities and need to make some separation between these entities." The resume also failed to show Berg's ownership and involvement with OK2, another SDVOSB.

d. In November 2019, CVE requested additional information from MDM regarding Berg's purchase of a portion of MDM. CVE noted that Berg's tax returns showed interests in Pro-Mark, OK2, Fed Serve, Marlin Creek Holdings, and other entities and asked MDM to provide a signed letter of explanation setting out any business relationship between MDM and the other entities in which Berg had interests. Walters emailed Berg and Hazer the request, noting, "Need to be very diligent in our answers on this one!"

e. Following CVE's letter, Berg emailed Walters a list of the businesses he owned so that he and Walters could consider how to respond to CVE. Berg included some language he had apparently copied from SBA regulations regarding affiliation between companies. Berg wrote, "Not sure if we want to scrap the idea of me buying in?????" Walters responded, "As I read this again I think we violate this with MCH, and also financial assistance. I'm not sure man . . . I don't want to scrap it but if violate these rules I definitely don't want to get booted or make the news . . ." (ellipses in original). MCH is an apparent reference to Berg's and Walter's company Marlin Creek Holdings.

f. In December 2019, MDM provided a letter to CVE signed by Walters and Berg indicating that the sale had been canceled and Walters would remain 100% owner.

87. Despite apparently recognizing that the close relationships and resource sharing between their companies could raise dependency concerns for CVE, MDM and Pro-Mark continued to share employees and resources:

a. For example, in January 2020, DuBois emailed Walters and Hazer documentation reflecting the number of days two Pro-Mark employees had

worked on MDM projects in South Dakota. Each employee had worked more

than 10 days in December and January on MDM projects.

b.  In September 2020, DuBois emailed Hazer to ask about the status of defensive

driving certificates that she was apparently preparing for Pro-Mark ahead of a

worker's compensation audit.

88.    MDM continues to actively seek and receive government contracts.  Its

registration in SAM was most recently renewed in December 2021 according to information

from SAM.gov.  It was awarded a federal contract as recently as January 2022 according to

information in the Federal Procurement Data System.

89.    Given the foregoing evidence, there is a probable cause to conclude that MDM,

Walters, and Berg have misrepresented control over MDM and the extent to which it is

influenced by and dependent on businesses controlled by Berg, such as Pro-Mark. Such

misrepresentations were material to the determination of whether MDM qualified as

veteran owned and controlled and therefore was eligible to receive SDVOSB set-aside

contracts.

**OK2 CONSTRUCTION, LLC**

90.    OK2 is a company purportedly majority-owned and controlled by Kenneth Kurk

that has been certified as an SDVOSB. Evidence establishes that, contrary to Kurk's

representations to CVE, OK2 is not controlled by him but is instead controlled by non-

veterans, including Berg. OK2 is so entwined with companies controlled by two non-

veterans that that OK2 likely would not qualify as an SDVOSB but for the material

misrepresentations made by Kurk and others.

91.    OK2 was organized under the laws of Texas in June 2015, according to

documentation it submitted to CVE. Its certificate of formation listed Berg as its organizer

58

and listed three governing persons: Berg; Kurk of Cleburne, Texas, who claims service-disabled veteran status; and Osvaldo "Ozzie" Cruz of Miami, Florida.

92.     Kurk also owns FedGenius LLC ("FedGenius"), a Texas-based consulting company. Tax records from 2015 to 2019 submitted to the SBA indicate that Kurk owned 30% of FedGenius and his wife Mallely Kurk owned 70%. FedGenius appears to have had a history of working projects with Berg and Cruz.

93.     Cruz, who does not claim to be a veteran, is an owner of several other businesses based in Miami. Tax records submitted to the SBA indicate that Cruz owns approximately 49% of OAC Action Construction Corp. ("OAC"), a general contracting company, with the remainder of the company owned by his father Orlando Cruz, Sr. OAC graduated from the 8(a) program in August 2012.

94.     OK2 sought verification as an SDVOSB in April 2016. In conjunction with its verification, Berg, Kurk, and Cruz filed VA forms 0877 indicating that Kurk owned 51% of OK2 and that Berg and Cruz each owned 24.5%. All three also affirmed on the forms that "at least 51% of the business is owned and controlled . . . . by Veterans or service-disabled Veterans."

95.     As part of the verification process, CVE requested additional information on the other businesses tied to Kurk, Cruz, and Berg. In response, Kurk wrote a May 2016 letter to CVE stating that he owned and worked at both OK2 and FedGenius. With regard to Pro-Mark and OAC, Kurk wrote that OK2 had no business relationship with the other companies and did not share facilities or employees with the other companies. Kurk represented, "OK2 Construction, LLC furnishes and pays for all of its own facilities/equipment/employees/etc, and does not rely on these other two companies for any resources." Kurk also wrote that, as he was the 51% owner of OK2, he was "the only individual with management powers" and that Berg and Cruz reported to him. Kurk finally

denied that OK2 shared work or contracts with OAC or Pro-Mark, although he indicated it might in the future engage either of the two for subcontracts.

96.    In June 2016, CVE verified OK2 as an SDVOSB based on the information OK2 presented in its application and subsequent documents.

97.    In August 2019, OK2 applied for reverification as an SDVOSB, submitting a VA Form 0877 on which Kurk, Berg, and Cruz again affirmed their ownership in the company and that it was 51% owned and controlled by a service-disabled veteran.

98.    OK2 has used its SDVOSB status to receive numerous government set-aside contracts, including from the Air Force, worth millions of dollars.

99.    Contrary to these representations, this investigation has found evidence indicating that Berg and Cruz exercised considerable control over OK2, and that OK2 was influenced by and dependent on Pro-Mark and OAC for employees and other resources. According to a CVE official interviewed during this investigation, reliance on another business, through the sharing of personnel, equipment, or management, would raise red flags for CVE and make it unlikely a company could be certified as an SDVOSB.

100.    Emails obtained via search warrant as well as bank records obtained via grand jury subpoena indicate that, despite Kurk's majority ownership of OK2, Berg and Cruz provided it with repeated cash injections to support OK2's ability to obtain bonding for the construction projects it bid. Kurk did not provide equivalent amounts of capital, despite his purported majority ownership. OK2's dependency on Berg and Cruz meant that Kurk, the only veteran owner of OK2, could not actually exercise the control that CVE required. Kurk, Berg, and Cruz also manipulated the amount of money in OK2's bank account to obtain those bonds.

a.  Review of emails and bank records has identified at most only two instances in which Kurk provided capital to OK2, both in 2015 and together totaling only $3,500.

b.  In June 2016, Berg and Cruz each provided OK2 $50,000, with OK2 signing promissory notes to repay the amount, so OK2 could seek performance bonds.

c.  In October 2016, Berg wrote to Kurk and Cruz, "I personally need to inject $100k into checking prior to 11/1 and then will transfer back the first part of November. Bonding wants to see that we have injected $200k total. Not a big deal already did it once." Bank records show that Berg made a $100,000 deposit to OK2's account on October 31, 2016, and that the $100,000 was transferred back to Berg's account on November 2.

d.  In December 2018, Berg wrote to Chad DuBois, who worked for Pro-Mark and was involved in its bookkeeping, and Pro-Mark's external accountant, Jason Luther, who was also the accountant for OK2, "I took a $300k distribution from Pro-mark to Kyle and Connie personal checking. I then deposited the $300k into OK2 checking for the year end books. After the 1st of the year I will distribute that $300k back to personal and then back to Pro-Mark." Bank records show that on December 31, 2018 Berg received $300,000 from Pro-Mark's account into his personal account, and then transferred the funds to OK2's account the same day. On January 10, 2019, Berg received $100,000 from OK2's account into his personal account and subsequently transferred the funds to Pro-Mark's account.

e.  In January 2019, Berg, Cruz, and Kurk discussed that Berg would contribute an additional $200,000 and Cruz $100,000 to support OK2's bonding. Berg also wrote that he and Cruz would be paid $50,000 from OK2 on April 1, apparently in repayment of some of their cash injections, "this way it will stay on the books

for the 1st quarter financials of 2019" and that otherwise the money would be

placed in an OK2 money market account and would not be touched.

f.  OK2's 2019 financial statements listed OK2 as having $400,000 in 6% notes

payable to Berg and Cruz, with no principal repayment terms but interest

payments due monthly.

101.   Evidence also indicates that Berg and Cruz sought to receive profits from OK2 in

apparent excess of or without regard for their formal ownership stakes in the company or

Kurk's representation to CVE that he was the 51% owner of OK2. The true information

regarding OK2's distribution of profits was material to CVE, which determines whether a

veteran controls a business in part by determining whether the veteran received at least

51% of the profits.

a.  In November 2018, Kurk discussed with Berg and DuBois that Cruz expected to

receive "50% of net profit on first 4 projects" by OK2 at an Air Force base, but

that Kurk was hoping to reduce Cruz's role going forward.

b.  In discussing how to move forward with the OK2 business, a few days later, Berg

wrote to Kurk and Cruz that he needed an "[e]ven split of profits 1/3 for each at

the end of the day" and stated that if Cruz and Kurk did not agree to that he

would look to "other SDVO opportunities with some local companies in the area

and figure out how I exit OK2." In the same email, Berg enumerated a number of

other things he wanted to discuss in more detail, including unemployment,

worker's compensation, a cash injection, and administrative fees for OAC and

Pro-Mark. After listing these items Berg seemed to acknowledge the risk of

affiliation, writing "Affiliation – As long as we are not continually paying OAC

and Pro-Mark we will be fine and after the 50% splits there should be no reason

to be paying OAC or Pro-Mark."

102.    Evidence indicates that Berg exercised de facto control over OK2, and that Kurk deferred to him regarding business decisions, as demonstrated below:

a.    In July 2016, Kurk requested Berg consent to provide a $500 sponsorship that Kurk thought might be good marketing, writing, "Kyle you're in charge of money for OK2."

b.    Kurk did not appear to have access to SAM.gov, the system through which the federal government lists contract opportunities and collects eligibility certifications, until 2020. In January 2017, Kurk asked Berg to enter an address for OK2 into SAM.

c.    In September 2017, Kurk sent Berg an expense report for Kurk's own business travel for Berg to approve for $1,640.37. Once Berg approved, Kurk asked his wife Mallely to write the OK2 check.

d.    In January 2018, Kurk told Berg that he needed $36,000 to pay his taxes and asked if OK2 could afford to pay him the money.

e.    In February 2019, Kurk again needed money from OK2 to pay for his taxes, and Berg wrote to him and Cruz that they could not touch the funds Berg and Cruz had injected into OK2 or its line of credit. Cruz agreed.

103.    The United States has also discovered evidence of a number of instances where OK2 relied on employees of Pro-Mark and OAC to perform office work and bid for and obtain government contracts, instead of using personnel employed by OK2. Emails obtained via search warrant demonstrate the following instances:

a.    In July 2016, Kurk emailed with OAC employee Willy Reina suggesting that Reina was bidding projects for OK2 and seeking out subcontractors.

b.    In February 2017 emails, Kurk and Reina worked to prepare OK2 bids for a number of projects, including a bid for a VA project.

c.   In June 2017 emails, Reina and Kurk discussed that Reina was working on pricing an OK2 proposal for a VA project.

d.   In a September 2017 email, Kurk asked a business partner to use Reina's OK2 email address "moving forward on matters related to OK2."

e.   In a December 2017 email, Reina submitted an OK2 bid for an Air Force project, using an OK2 email address to submit the bid, and including a signature block that identified him as an OK2 employee.

f.   In August 2018, Reina submitted an OK2 bid for an Air Force project, from an OK2 email address and with a signature block that identified him as an OK2 employee.

g.   Payroll records for OK2 received via grand jury subpoena show that Reina was not paid by OK2 until July 2019. At that time, Kurk emailed Pro-Mark office manager Mandy Grant to ask her to start paying Reina from OK2 part-time.

h.   In June 2016, Kurk forwarded an OK2 bid to Grant to have pricing terms and bid bond information inserted into it.

i.   In July 2016, Grant submitted an OK2 bid to the U.S. Fish and Wildlife Service, using an OK2 email address and with a signature block that stated she worked for OK2.

j.   In August 2016, Berg requested that the external accountants shared by Pro-Mark and OK2, Jason and Denise Luther, make payments to Grant and several other Pro-Mark employees for hours worked on behalf of OK2.

k.   In January 2017, Kurk emailed Grant to ask her to order a bid bond for an OK2 project. Grant responded it had already been ordered.

l.  Payroll records for OK2 indicate that Grant was paid approximately $138 per
    week by OK2 between August 2016 and May 2017, but then nothing until May
    2020, when the same weekly payment resumed.

m.  In January 2018, Grant submitted documents relating to a National Park
    Service project from an OK2 email address. The documents included a letter in
    Grant's name as a representative of OK2, identifying the OK2 project manager
    and superintendent for the project. According to payroll records for OK2 and Pro-
    Mark obtained via grand jury subpoena, the identified project manager, Chad
    Davis, has never been paid by OK2 but was paid at the time by Pro-Mark.

n.  In June 2018, Grant submitted further documents to the National Park Service
    on behalf of OK2 from an OK2 email address, and with a signature block that
    stated she was an OK2 employee.

o.  In April 2019 emails, Grant submitted payroll for OK2 to one of OK2's external
    accountants, Denise Luther, and resolved complaints from an OK2 employee that
    he was not paid for all his hours.

p.  In February 2020 emails, Grant again submitted payroll for OK2 to one of OK2's
    external accountants, Denise Luther.

q.  Pro-Mark controller Chad DuBois assembled financial statements for OK2. For
    example, in August 2018, DuBois emailed Cruz and Kurk seeking documentation
    on a number of projects, because he was putting together end of quarter financial
    statements for OK2.

r.  In October 2018, DuBois again emailed with Kurk and Cruz because he was
    putting together OK2's financial statements, with DuBois this time stating that
    it was at the bonding company's request.

s.  In January 2019, DuBois emailed with Kurk, Cruz, and Berg, stating that he
    was working on OK2 financials and needed some additional invoice paperwork.

t.  In 2019, OK2 submitted 20 check images to CVE as part of its reverification
    application. The checks date from January and February 2019 and are all signed
    by DuBois. When asked by CVE who had signed the checks, Kurk provided a
    letter of explanation on June 12, 2019 to CVE stating that the checks were
    signed by DuBois, "who serves as the financial controller for OK2 Construction,
    LLC." OK2 did not pay DuBois at the time he worked on the above financial
    statements for OK2 or prepared the checks OK2 submitted to CVE.

u.  In late March 2019, Berg emailed OK2's external accountants, the Luthers, to
    state that OK2 would begin paying DuBois $700 per month.

v.  Payroll records for OK2 indicate that DuBois was not paid by OK2 until May
    2019. After an initial payment of $591, he began receiving weekly payments of
    approximately $139.

w.  In June 2017, Kurk emailed Cruz and Reina stating that he had been surprised
    to learn a Miami VA project OK2 was interested in had a site visit the next day,
    and asked Cruz if he could send someone to the site visit. Cruz responded that
    OAC employee Lily Mendoza would be attending.

x.  Payroll records for OK2 obtained via grand jury subpoena indicate it has never
    paid Lily Mendoza.

y.  In August 2018, a Pro-Mark project manager, Kevin Pietruszewski, wrote to an
    Indian Health Services employee regarding Pro-Mark's design drawings for a
    project. The next day, Pietruszewski followed up with the employee from his OK2
    email explaining that because of "issues with our Pro-Mark Services Email," he
    was resending the email "from another company that we have." Pietruszewski's

signature block on his OK2 email also indicated that he was a Project Manager for OK2.

z. Payroll records for OK2 indicate that it paid Pietruszewski $135 per week from August 2016 through May 2017, but Pietruszewski was not receiving payment as of August 2018, the time of his corresponding with Indian Health Services on behalf of OK2.

104. At the same time that OK2 was making use of Pro-Mark employee Grant and OAC employee Reina to perform OK2 work, Kurk also listed Grant and Reina as references for past performances on government proposals. In July 2016, Kurk emailed Grant and Reina, copying their employers Berg and Cruz, to inform them that they had been listed as references for OK2 and that he had "provided a response that I would appreciate you would respond with." The proposed reference script required Grant and Reina to rate Kurk and OK2's performance as "Good to Excellent." Kurk subsequently sent Reina two written references to submit for OK2 in Reina's name, relating to OK2 bids for Air Force contracts. The references prepared by Kurk stated that OAC and Reina had worked with OK2, which was founded in 2015, since 2011 and rated OK2 as "Exceptional" in all applicable categories.

105. Finally, evidence indicates that OK2 used Pro-Mark and OAC facilities, as well as other facilities connected to Berg and Cruz. Evidence indicates that the offices were initially conceived as virtual offices or facades, as shown below from emails obtained via search warrant:

a. In August 2016, Kurk wrote to Berg, Cruz, and Grant, "Just about every single contract we've bid the contracting officer has called me to quiz me on OK2's knowledge and ability to perform in ND/SD/MN and FL/GA/MS with the Texas address. I really think we should figure out a way to create an OK2 address in

ND and FL. So far, I believe I've been able to eliminate concerns they have about

OK2's Texas address but it's obvious to me, it's a red flag for them."

b.   In January 2017, Kurk again emailed with Berg, Cruz, and Grant. He asked

Berg, who apparently controlled access to SAM for OK2, to add a Miami address

into SAM for OK2: 11980 SW 144 Court, Suite 102. Kurk wrote,

> Ozzie has several offices and this one he has that we can use for
> OK2. In the past — I've had the contracting office from Robbins
> AFB and Miami VA, specifically state to me that our office
> address in Texas was a concern and suggested it would better
> that we had a local office.

Kurk continued that Berg should also think about obtaining an address for OK2

in North Dakota as well. At that time, Cruz's email signature for his OAC email

address noted that OAC had a new address, 11980 SW 144 Ct, Suite 101 in

Miami.

c.   In November 2018, Kurk wrote in an internal OK2 performance report he sent to

Berg and DuBois that OK2 employee Billy Thomas, who was working in Florida,

was "supported with OAC truck/gas card/office expenses" and a goal for 2019 was

to get Thomas an OK2 office.

d.   In March 2019, OK2 signed a two-year lease with OAC Group Properties, LLC

for 1,000 square feet of office space at 11980 SW 144 Ct, Suite 103 in Miami. The

monthly payment was $900 per month. The notice address for OAC Group

Properties was next door, 11980 SW 144 Ct, Suite 101, with notice to be directed

to the attention of Cruz. Kurk signed on behalf of OK2 and Cruz signed on behalf

of OAC Group Properties, LLC.

e.   Also in March 2019, OK2 signed a two-year lease with Berg's real estate

company, KRB Holdings, for 1,000 square feet of space in West Fargo, North

Dakota at 3271 Oak Ridge Loop E. Rent was also $900 per month. The notice

address for KRB Holdings was the same, 3247 Oak Ridge Loop E, with notice to be directed to the attention of Berg. Kurk signed on behalf of OK2 and Berg signed on behalf of KRB Holdings.

f.   After the leases were provided to CVE, CVE asked OK2 to disclose any business relationship between OK2, KRB Holdings, and OAC Group Properties, LLC. In June 2019, Kurk wrote a letter to CVE stating that OK2 did not have a business relationship with either company or share or pay for services with the companies. The letter did not discuss the connection of each property company to OK2's minority owners, or any connections between the companies owned by each minority owner.

g.   In May 2021, a competitor of OK2's protested to the SBA that OK2 was not a small business because of its affiliation with a number of other entities, including OK2's relationship with Pro-Mark, based on Berg's position with Pro-Mark and his wife Connie's ownership of Pro-Mark. The documentation supporting the protest relied primarily on publicly available information. In June 2021, OK2 provided a response signed by Kurk. Kurk wrote that, while Berg had worked for Pro-Mark previously, he had stepped down in August 2020 and that Connie Berg was no longer the owner of Pro-Mark. The letter did not address OK2's financial dependence on Berg and Cruz or its reliance on employees and facilities of Pro-Mark and OAC (neither had been raised by the initial protest). The SBA subsequently rejected the challenge.

106.   OK2 continues to actively seek and receive government contracts.  Its registration in SAM was most recently renewed in November 2021 according to information from SAM.gov.  It was awarded a federal contract as recently as January 2022 according to information in the Federal Procurement Data System.

107.   Given the foregoing evidence, there is probable cause to conclude that OK2, Kurk,

Berg, and Cruz have misrepresented who controls OK2 and the extent to which it is

influenced by and dependent on businesses controlled by Berg and Cruz such as Pro-Mark

and OAC. Such misrepresentations were material to the determination of whether OK2

qualified as veteran owned and controlled and therefore was eligible to receive SDVOSB

set-aside contracts.

## PROBABLE CAUSE TO SEARCH THE PREMISES

108.   There is probable cause to believe that the PREMISES is the current home of

Berg and Connie.

109.   Property records obtained from the City of West Fargo indicate that the deed for

the PREMISES is held by Kyle and Connie Berg as trustees of the Kyle Berg Revocable

Living Trust and/or the Connie Berg Revocable Living Trust.

110.   Bank records obtained via grand jury subpoena list Berg and Connie's residential

address as the PREMISES.

111.   In November 2018, Berg provided Kurk information for bonding, including his

home address, which he listed as the PREMISES.

112.   In June 2020, Grant submitted a base pass to the Air Force on behalf of Berg,

listing his home address as the PREMISES.

113.   Observation, surveillance, and photographs taken of the PREMISES by law

enforcement personnel indicate that the PREMISES is a detached single-family house

predominantly tan in color with brick and vinyl facades facing the street and is currently

occupied by Berg and his family.

    a.   On May 14, 2021, law enforcement personnel observed Connie Berg unload

        groceries at the PREMISES and later observed Connie and Kyle Berg depart the

        PREMISES together in a black Ford F-150 Raptor bearing North Dakota license

plate ND 548DEP. Review of law enforcement databases confirmed that the vehicle is registered to Berg.

b. On May 16, 2021, law enforcement personnel observed Connie and Kyle Berg arrive at the PREMISES in the black Ford F-150 Raptor registered to Berg.

c. On May 17, 2021, law enforcement personnel observed a black Ford F-150 bearing the license plate ND 321CVJ parked in front of the PREMISES. Review of law enforcement databases confirmed that this vehicle is registered to Berg. On the same day, law enforcement personnel observed a black Range Rover bearing the license plate ND 992DBY parked in the garage of the residence. Review of law enforcement databases confirmed that this vehicle is registered to Connie Berg.

114.   In addition, there is probable cause to believe that Berg is using the PREMISES as an office and business address for Fed Serve based upon emails and documents submitted to government agencies.

a. Documents obtained from the North Dakota Secretary of State list Berg as Fed Serve's registered agent; the PREMISES are listed as both the physical and the mailing address for Fed Serve in this filing.

b. Fed Serve maintains a business bank account at Starion Bank in North Dakota. The checks for this account list Fed Serve's address as the PREMISES, according to documents obtained pursuant to a grand jury subpoena.

c. A review of criminal mail covers from August and September 2020 and April 2021, indicate that Fed Serve receives mail at the PREMISES.

d. A review of criminal mail covers from December 2021 indicate that Fed Serve sent mail to Tunheim Construction, and included in its return address on the envelope the address of the PREMISES.

e.  In May 2020, Fed Serve submitted a bid and experience questionnaire to the National Parks Service, listing Fed Serve's address as the PREMISES.

f.  In August 2020, Fed Serve submitted a bid for an Air Force contract, indicating that it was a small, HUBZone business, and listing the PREMISES as the company's address.

g.  Berg's Fed Serve email signature indicates that he is the president of the company and lists its business address as the PREMISES; Berg used this email address to communicate with government contracting officers, including representatives from the Air Force and the U.S. Department of Agriculture in October 2020.

h.  In October 2020, the Air Force sent Fed Serve a request for proposal for a project; the letter listed the PREMISES as Fed Serve's address.

115.   In addition to Fed Serve, as described above, there is probable cause to believe that Berg has been and continues to be involved in the businesses or Pro-Mark, Razor, MDM, and OK2:

a.  As set forth in Paragraphs 43 through 51, Berg directed all day-to-day business operations and strategy for Pro-Mark. Even after Pro-Mark was sold through the ESOP in August 2020, Berg continued to exercise control over the business.

b.  As set forth in Paragraphs 62 and 63, Berg, and other Pro-Mark employees he supervises, control and manage the day-to-day of Razor's government contracting business.

c.  As set forth in Paragraphs 82 through 84, and Paragraph 86, MDM shares access to business records with Fed Serve and shares employees, resources, and facilities with Pro-Mark.

    d.  As set forth in Paragraphs 98 through 102, and Paragraph 104, Berg exercises considerable control over OK2 and OK2 is dependent on Pro-Mark for employees and other resources.

116.   I know, based on my training and experience, that owners and operators of small businesses commonly operate those businesses out of their personal residences, including home offices, and commonly take records and documents home from their business offices, including records on laptop computers, tablets, and smart phones. Such records and documents are commonly maintained for an extended period of time.

117.   In addition, I know, based on my training and experience, that businesses such as Fed Serve keep and maintain electronic and hard-copy records, books, receipts, notes, ledgers, bank records, money orders, corporate filings, and other papers related to the importation, manufacture, transportation, ordering, sales, and distribution of goods and services related to work performed in order to gain and complete government contracts.  These records are commonly maintained for an extended period of time.

118.   Additionally, government agencies commonly require contractors to maintain contract records for a period of time after a contract is completed.  The SBA specifically requires HUBZone small businesses to retain copies of documents demonstrating compliance with HUBZone eligibility for a period of six years from the date of application (Fed Serve submitted its HUBZone application in 2019). Businesses are also required to maintain records for federal and state tax purposes.  Furthermore, companies often store their records on computers, and utilize computer hardware and software to do so.  The items to be seized are more fully described in Attachment B (attached hereto and incorporated herein).

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

119.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

120.    *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

74

has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.   In my training and experience, contractors such as Fed Serve commonly use computers and electronic storage media for tasks such as, among others, sending email communications to government agencies and preparing bid, contract, and financial records.

f.   Based on actual inspection of other evidence related to this investigation, such as emails, contract files, financial records, and invoices, I am aware that computer equipment was used to generate, store, and print documents used in the contracting fraud scheme. There is reason to believe that there is a computer system currently located on the PREMISES.

121.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs

76

may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to

destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

122.   *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted

78

files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

123. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

124. Fed Serve (the "Company") is a functioning company that conducts legitimate business. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## BIOMETRIC ACCESS TO DEVICES

125. The warrant I am applying for would permit law enforcement to obtain from Berg, Connie, or other persons located at the PREMISES listed in Attachment A the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial

characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that

81

match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of digital devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the

passcode or password has not been entered in the last 156 hours. Biometric

features from other brands carry similar restrictions. Thus, in the event law

enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a biometric feature may

exist for only a short time.

126.    Due to the foregoing, if law enforcement personnel encounter a device that is

subject to search and seizure pursuant to this warrant and may be unlocked using one of

the aforementioned biometric features, the warrant I am applying for would permit law

enforcement personnel to (1) press or swipe the fingers (including thumbs) of Berg, Connie,

or other persons located at PREMISES listed in Attachment A, to the fingerprint scanner of

the device; (2) hold the device in front of the face of Berg, Connie, or other persons located

at PREMISES listed in Attachment A and activate the facial recognition feature, for the

purpose of attempting to unlock the device in order to search its contents as authorized by

this warrant. In general, unsuccessful attempts to use biometric characteristics to unlock

the devices will not damage them.

### CONCLUSION

127.    I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

**AARON DUNN**
Special Agent
FBI

Subscribed and sworn to before me on March 1, 2022

83

Honorable Alice R. Senechal
UNITED STATES MAGISTRATE JUDGE